UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. |
| | : | |
| | : | VIOLATIONS: |
| | : | |
| | : | 50 U.S.C. § 1705 |
| v. | : | (International Emergency Economic |
| | : | Powers Act) |
| BARCLAYS BANK PLC, | : | |
| | : | 50 U.S.C. app. §§ 5 and 16 |
| | : | (Trading with the Enemy Act) |
| Defendant. | : | |

## INFORMATION

The United States informs the Court that:

### GENERAL ALLEGATIONS

At all times material to this Information:

1. Defendant, Barclays Bank PLC ("Barclays"), was a financial institution registered and organized under the laws of England and Wales.

2. Defendant Barclays was subject to oversight and regulation in the United States by the Board of Governors of the Federal Reserve System.

3. Defendant Barclays conducted United States Dollar ("USD") clearing at Barclays' branch in New York, New York (the "New York Branch"), as well as at other financial institutions located in New York and elsewhere in the United States.

4. From in and about March 1995 continuing through in and about September 2006, Barclays knowingly and willfully facilitated USD transactions for a number of parties and

countries sanctioned by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") (collectively, the "Sanctioned Entities"), including but not limited to banks from Cuba, Iran, Libya, Sudan and Burma.

5. Barclays engaged in this criminal conduct by: (a) following instructions, principally from banks in Cuba, Iran, Libya, Sudan, and Burma, not to mention the banks' names in USD payment messages sent to the New York Branch and to other financial institutions located in the United States; (b) routing USD payments through an internal Barclays sundry account to hide the payments' connection to Sanctioned Entities; (c) amending or reformatting USD payment messages to remove information identifying Sanctioned Entities; and (d) deliberately using a less transparent method of payment messages, known as cover payments.

6. The United States employed sanctions and embargoes against Cuba, Iran, Libya, Sudan and Burma.

7. OFAC, which is located in the District of Columbia, administered and enforced, among other things, economic and trade sanctions against Cuba, Iran, Libya, Sudan and Burma, and Cuban, Iranian, Libyan, Sudanese and Burmese banks and entities. OFAC acted under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on certain transactions. OFAC was empowered to authorize transactions with these countries and entities through the granting of a license.

8. At all times material to the Information, the Cuban Sanctions, Iranian Sanctions, Libyan Sanctions, Sudanese Sanctions and Burmese Sanctions were in effect.

## The Cuban Sanctions

9. Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States had maintained an economic embargo against Cuba through the enactment of various laws and regulations restricting United States trade and economic transactions with Cuba. OFAC controlled imports and blocked all transactions relating to Cuban assets based upon the Cuban Assets Control Regulations ("CACR"), which were promulgated under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. app. §§ 1-44.

10. Unless authorized by OFAC, United States persons were prohibited from engaging in financial transactions by, at the direction of, or for the benefit of, Cuba or Cuban nationals, or which involved property in which Cuba or Cuban nationals had any direct or indirect interest, including all "transfers of credit and all payments" and "transactions in foreign exchange." 31 C.F.R. § 515.201(a). Unless authorized by OFAC, United States persons were prohibited from engaging in transactions involving property in which Cuba or Cuban nationals had any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b). The Cuban Assets Control Regulations also prohibited any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations. 31 C.F.R. § 515.201(c).

### International Emergency Economic Powers Act

11. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions against a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

### The Iranian Sanctions

12. On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."

13. Executive Order Nos. 12957, 12959, and 13059 (collectively, the "Iranian Executive Orders") imposed economic sanctions, including a trade embargo, on Iran. The Iranian Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Iranian Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

### The Iranian Transactions Regulations

14. The Iranian Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Iranian Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Iranian Executive Orders.

15. The Iranian Transactions Regulations:

   a. Provided that no goods, technology, or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization. 31 C.F.R. § 560.204.

   b. Prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560. 31 C.F.R. § 560.203.

### The Libyan Sanctions

16. On January 7, 1986, President Ronald Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. One day later, the President issued Executive Order No. 12544, which also ordered the blocking of all property and interests in property of the Government of Libya. President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until

September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

## The Sudanese Sanctions

17. On November 3, 1997, President William J. Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade- and service-related transactions with Sudan by United States persons, including financing, facilitating or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

Case 1:10-cr-00218-EGS Document 1 Filed 08/16/10 Page 7 of 9

## The Burmese Sanctions

18. On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

19. On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta. To implement the BFDA and to take additional steps, President Bush issued Executive Order No. 13310 on July 28, 2003, which blocked all property and interests in property of certain listed Burmese entities and provided for the blocking of property and interest in property of other individuals and entities meeting the criteria set forth in Executive Order No. 13310. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located. The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

## COUNT ONE
## INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT
## (50 U.S.C. § 1705)

1. Paragraphs 1 through 19 of the General Allegations are re-alleged as if fully set forth herein.

2. From in or about March 1995, and continuing until in or about September 2006, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, the defendant, BARCLAYS BANK PLC, did willfully violate regulations issued under the International Emergency Economic Powers Act, in violation of Title 50, United States Code, Section 1705.

## COUNT TWO
## TRADING WITH THE ENEMY ACT
### (50 U.S.C. app. §§ 5 and 16)

1. Paragraphs 1 through 19 of the General Allegations are re-alleged as if fully set forth herein.

2. From in or about January 2001, and continuing until in or about September 2006, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, the defendant, BARCLAYS BANK PLC, did willfully violate regulations issued under the Trading With the Enemy Act, in violation of Title 50, United States Code Appendix, Sections 5 and 16.

JENNIFER SHASKY CALVERY, Chief
Asset Forfeiture and Money
Laundering Section

By: /s/ Frederick Reynolds

FREDERICK REYNOLDS
TEXAS BAR 24003453
Senior Trial Attorney

KEVIN GERRITY
TEXAS BAR 24025378
Trial Attorney
Asset Forfeiture and Money Laundering Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C. 20005
(202) 514-1263

Date: August 16, 2010