# **Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | |
| BARCLAYS BANK PLC, | ) | |
| | ) | DEFERRED PROSECUTION |
| Defendant. | ) | AGREEMENT |
| | ) | |
| | ) | |
| | ) | |

Defendant Barclays Bank PLC ("Barclays"), a financial institution registered and organized under the laws of England and Wales, as authorized to specifically act and approve this agreement by the Board of Barclays in a corporate resolution dated August 11, 2010, hereby enters into this Deferred Prosecution Agreement (the "Agreement") with the Asset Forfeiture and Money Laundering Section of the Criminal Division of the United States Department of Justice (the "United States").

1.    **Charges**: Barclays agrees that it shall waive indictment and agrees to the filing of a two-count Criminal Information in the United States District Court for the District of Columbia, charging it with: (1) willfully violating and attempting to violate the Trading with the Enemy Act, 50 U.S.C. app. §§ 5, 16, and regulations issued thereunder; and (2) willfully violating and attempting to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1705, and regulations issued thereunder.

2.    **Acceptance of Responsibility**:    Barclays accepts and acknowledges responsibility for its conduct and that of its employees as set forth in the Factual Statement attached hereto as Exhibit 1 and incorporated herein by reference (the "Factual

Statement"). If the United States, pursuant to Paragraph 9 of this Agreement, initiates a prosecution that is deferred by this Agreement against Barclays, Barclays agrees that it will neither contest the admissibility of the Factual Statement, reports, or any other documents provided by Barclays to the United States, nor contradict in any such proceeding the facts contained within the Factual Statement. Barclays waives and foregoes any right under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other rule, to assert that any plea, plea discussions, and any related statements made by or on behalf of Barclays prior or subsequent to this Agreement, or any leads derived therefrom, should be inadmissible, suppressed, or otherwise excluded from evidence at any judicial proceeding arising from this Agreement. Barclays further agrees that any and all statements and admissions, in any form, made by or on behalf of Barclays or any employee or representative of Barclays during the course of negotiations concerning this Agreement or at any other time, or any leads from such statements or admissions, shall be admissible in evidence in any and all criminal proceedings arising from this Agreement.

3. **Forfeiture Amount**: As a result of Barclays' conduct, including the conduct set forth in the Factual Statement, the parties agree that the United States could institute a civil and/or criminal forfeiture action against certain funds held by Barclays and that such funds would be forfeitable pursuant to either Section 981 or 982 of Title 18 of the United States Code. Barclays hereby acknowledges that at least $298,000,000 was involved in transactions described in the Factual Statement, and that such transactions by Barclays, or involving funds that were held at, or passed through certain accounts at Barclays, violated: 50 U.S.C. app. §§ 5, 16, and the regulations issued thereunder; and 50

U.S.C. § 1705, and the regulations issued thereunder. In lieu of forfeiture resulting from a criminal forfeiture proceeding, Barclays hereby agrees to pay to the United States the sum of $149,000,000[1] (the "Forfeiture Amount"). Barclays hereby agrees that the funds paid by Barclays pursuant to this Agreement shall be considered substitute *res* for the purpose of forfeiture to the United States pursuant to either 981 or 982 of Title 18 of the United States Code, and Barclays releases any and all claims it may have to such funds. Barclays shall pay the Forfeiture Amount within three (3) business days from Court approval of this Agreement pursuant to payment instructions as directed by the United States in its sole discretion.

4.     **Court is Not Bound**: Barclays and the United States understand that the Agreement must be approved by the United States District Court for the District of Columbia, in accordance with 18 U.S.C. § 3161(h)(2). If that Court declines to approve this Agreement for any reason, the United States and Barclays are released from any obligation imposed upon them by this Agreement, this Agreement shall be null and void, and the United States shall not premise any prosecution of Barclays upon any admissions or acknowledgements contained herein, including in the Factual Statement.

5.     **Deferral of Prosecution**: In consideration of Barclays' remedial actions to date and its willingness to: (a) acknowledge responsibility for its actions; (b) voluntarily disclose its conduct; (c) voluntarily produce documents and reports which describe its conduct; (d) voluntarily terminate the conduct set forth in the Factual Statement prior to the commencement of the United States' investigation; (e) continue its

---

[1] Barclays has also agreed to pay a separate and additional $149,000,000 pursuant to a Deferred Prosecution Agreement with the District Attorney of the County of New York being entered into contemporaneously, resulting in an overall total amount of $298,000,000.

cooperation with the United States as stated in Paragraph 6; (f) demonstrate its implementation of policies and procedures to comply with provisions of the Financial Action Task Force International Anti-Money Laundering and Combating Financing of Terrorism best practices and the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking; and (g) settle any and all civil and criminal claims currently held by the United States for any act within the scope of the Factual Statement, the United States agrees as follows:

        i.     the United States shall recommend to the Court, pursuant to 18 U.S.C. § 3161(h)(2), that prosecution of Barclays on the Information filed pursuant to Paragraph 1 be deferred for a period of twenty-four (24) months, or less at the discretion of the United States, from the date of the filing of the Information referred to in Paragraph 1. Barclays shall consent to a motion, the contents to be agreed upon by the parties, to be filed by the United States with the Court promptly upon execution of this Agreement, pursuant to 18 U.S.C. § 3161(h)(2), in which the United States will present this Agreement to the Court and move for a continuance of all further criminal proceedings, including trial, for a period of twenty-four (24) months, for speedy trial exclusion of all time covered by such a continuance, and for approval by the Court of this deferred prosecution. Barclays further agrees to waive, and does hereby expressly waive, any and all rights to a speedy trial pursuant to the Fifth and Sixth Amendments of the United States Constitution, 18 U.S.C. § 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the District of Columbia for the period that this Agreement is in effect; and

ii.     the United States shall, if Barclays is in full compliance with all of its obligations under this Agreement, within thirty (30) days of the expiration of the time period set forth above in Paragraph 5(i), or less at the discretion of the United States, seek dismissal with prejudice of the Information filed against Barclays pursuant to Paragraph 1, and this Agreement shall expire and be of no further force or effect.

6.      **Cooperation**:  Barclays agrees, acknowledges, and understands that its cooperation with this investigation and any subsequent prosecution against other entities or individuals is an important and material factor underlying the decision by the United States to enter into this Agreement.  Barclays agrees for the duration of this agreement, in accordance with and subject to all applicable United States and foreign law, to cooperate fully and honestly with the United States, and with any other federal, state or local governmental department or agency designated by the United States ("Designated Agency" or "Designated Agencies"), relating to the Information and Factual Statement. This cooperation includes the following, subject to the limitations set forth in paragraph 6(k) of this Agreement:

(a)     By August 6, 2011, Barclays' Head of Compliance and Regulatory Affairs must certify that comprehensive training on Barclays policy regarding U.N., U.S., and E.U. sanctions has been completed by all employees who are: (1) involved in the processing or investigation of United States Dollar ("USD") payments and their direct or indirect supervisors; (2) involved in execution of USD-denominated securities trading orders and their direct or indirect supervisors; and (3) U.S. citizens located outside the United States who are involved in transactions or business activities involving cross-border payments;

(b)     By August 30, 2010, Barclays Head of Compliance and Regulatory Affairs must further certify that Barclays has implemented a written policy to require the use of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") Message Type ("MT") 202COV bank-to-bank payment message where appropriate under SWIFT guidelines;

(c)     Barclays must maintain the electronic database of SWIFT MT payment messages and other internal Barclays documents, collected and maintained by Barclays external counsel in connection with Barclays' investigation into this matter, relating to USD payments processed during the period from 2000 through June 30, 2007 in electronic format for a period of five years from the execution of this Agreement;

(d)     Barclays must completely and truthfully disclose to the United States all information and materials in its possession, custody, or control relating to any transaction within the scope of or relating to the Factual Statement that the United States or its Designated Agency may request, including, but not limited to, all information about the activities of Barclays present and former directors, officers, employees, consultants, representatives, agents, subsidiary entities, minority-owned entities, and affiliated entities;

(e)     Barclays must assemble, organize, translate, and provide, in a responsive and prompt fashion, all information and materials in the possession, custody, or control of Barclays relating to any transaction within the scope of or relating to the Factual Statement as may be requested by the United States;

(f)     Barclays must use its good faith efforts to make available, at its cost, Barclays' and its successors' current and former directors, officers, employees,

consultants, representatives, and agents, to provide information and materials, and to testify as requested by the United States, including sworn testimony before a grand jury or in any judicial proceeding, and interviews with the United States and Designated Agencies relating to any transaction within the scope of or relating to the Factual Statement;

(g)     Barclays must provide information, materials, and testimony as necessary or requested to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding;

(h)     Barclays must implement compliance procedures and training designed to ensure that the Barclays compliance officer in charge of sanctions is made aware, in a timely manner, of any known requests or attempts by any entity (including, but not limited to, Barclays' customers, financial institutions, companies, organizations, groups, or persons) to withhold or alter its name or other identifying information where the request or attempt appears to be related to circumventing or evading U.S. sanctions laws. Barclays' Head of Compliance and Regulatory Affairs, or his or her designee, shall report to the United States the name and contact information of any entity that makes such a request;

(i)     Barclays must abide by any and all orders and regulations regarding remedial measures or other required actions related to this matter issued by either (1) the Board of Governors of the Federal Reserve System or (2)  the Office of Foreign Assets Control of the United States Department of the Treasury;

(j)     Barclays must provide certification by Barclays' Head of Compliance and Regulatory Affairs twenty-one (21) months from execution of this Agreement that he or she (1) has reviewed the foregoing commitments contained in Paragraph 6 of this Agreement; (2) has made inquiries with relevant Barclays personnel, including the responsible heads of internal audit and operations; and (3) based on those inquiries, can attest that Barclays has, to the best of such officer's ability to determine, complied with the commitments contained in Paragraph 6 of this Agreement; and

(k)     Barclays must, to the extent that a United States request requires transmittal through formal government channels, use its best efforts to facilitate such transmittal and agree not to oppose any request made in accordance with applicable law either publicly or privately.  Nothing in this Agreement shall be construed to require Barclays to produce any documents, records or tangible evidence that are protected by the attorney-client privilege or work-product doctrine of the United Kingdom or other applicable confidentiality, criminal, or data protection laws.

7.     **Government Commitments**:   In return for the full and truthful cooperation of Barclays and compliance with the terms and conditions of this Agreement, the United States agrees that it shall not seek to prosecute Barclays, its corporate parents, subsidiaries, affiliates, successors, predecessors, and assigns for any act within the scope of the Factual Statement, unless:  (a) other than the transactions that have already been disclosed and documented to the United States, Barclays willfully transmitted or approved the transmission of USD-denominated funds that went to or came from persons or entities designated at the time of the transaction by the Office of Foreign Assets Control as a Specially Designated Terrorist, a Specially Designated Global Terrorist, a

Foreign Terrorist Organization, or a proliferator of Weapons of Mass Destruction (an "Undisclosed Special SDN Transaction"); or (b) in the sole reasonable discretion of the United States, there is a material breach of this Agreement. In the event of a breach resulting in a prosecution of Barclays or a prosecution related to an Undisclosed Special SDN Transaction, the United States may use any information provided by or on behalf of Barclays to the United States or any investigative agency, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement.

8.  **Waiver of Rights**:   Barclays expressly waives, for purposes of this Agreement and any action resulting from a breach of this Agreement:

(a)  any challenges to the venue or jurisdiction of the United States District Court for the District of Columbia; and

(b)  any right to be charged by an Indictment returned by a grand jury, and agrees to be prosecuted on the Information filed in this matter or on a superseding Information arising from the facts presented in the Factual Statement.

9.  **Breach of the Agreement**:   If the United States determines that Barclays has committed a material breach of any provision of this Agreement, the United States shall provide written notice to Barclays' counsel of the alleged breach and provide Barclays with a two-week period from the date of receipt of said notice, or longer at the discretion of the United States, in which to make a presentation to the United States to demonstrate that no breach has occurred or, to the extent applicable, that the breach is not material, or has been cured. The parties hereto expressly understand and agree that if Barclays fails to make the above-noted presentation within such time period, it shall be

presumed that Barclays is in material breach of this Agreement. The parties further understand and agree that the United States' exercise of discretion under this paragraph is not subject to review in any court or tribunal outside the Criminal Division of the Department of Justice. In the event of a breach of this Agreement that results in a prosecution, such prosecution may be premised upon any information provided by or on behalf of Barclays to the United States or any Designated Agency, whether prior to or subsequent to this Agreement, and/or any leads derived from such information, including the attached Factual Statement, unless otherwise agreed to by the United States and Barclays in writing at the time the information was provided to the United States. Barclays hereby further expressly agrees that within six months of a determination by the United States that a material breach of this Agreement has occurred, any violations of federal law that were not time-barred by the applicable statute of limitations as of the execution of this Agreement, including any claims covered by the tolling agreement signed by the parties, and that: (a) relate to the Factual Statement; or (b) were hereinafter discovered by the United States, may in the sole reasonable discretion of the United States be charged against Barclays, notwithstanding the provisions or expiration of any applicable statute of limitations.

10.    **Requirement to Obey the Law**:  If the United States determines during the term of this Agreement that Barclays has committed any federal crime after the execution of this Agreement, Barclays shall, in the sole discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge, including but not limited to the conduct described in the Factual Statement.

The discovery by the United States of any purely historical criminal conduct that did not take place during the term of the Agreement will not constitute a breach of this provision.

11.      **Parties Bound by the Agreement**:  This Agreement and all provisions set forth herein bind Barclays and any of its corporate parents, subsidiaries, affiliates, successors, predecessors, and assigns.  It is further understood that this Agreement and all provisions set forth herein are binding on the United States, but specifically do not bind any federal agencies, or any state or local authorities, although the United States will bring the cooperation of Barclays and its compliance with its other obligations under this Agreement to the attention of federal, state, or local prosecuting offices or regulatory agencies, if requested by Barclays or its attorneys.

12.      **Public Statements**:  Barclays expressly agrees that it shall not, through its attorneys, board of directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, make any public statement contradicting, excusing, or justifying any statement of fact contained in the Factual Statement.  Any such public statement by Barclays, its attorneys, board of directors, agents, officers, employees, consultants, contractors, subcontractors, or representatives, including any person or entity controlled by any of them, shall constitute a material breach of this Agreement as governed by Paragraph 9 of this Agreement, and Barclays would thereafter be subject to prosecution pursuant to the terms of this Agreement.  The decision of whether any public statement by any such person contradicting, excusing, or justifying a fact contained in the Factual Statement will be imputed to Barclays for the purpose of determining whether Barclays has breached this Agreement shall be in the sole and reasonable discretion of the United States.  Upon

the United States' notification to Barclays of a public statement by any such person that in whole or in part contradicts, excuses, or justifies a statement of fact contained in the Factual Statement, Barclays may avoid breach of this Agreement by publicly repudiating such statement within seventy-two (72) hours after notification by the United States. This paragraph is not intended to apply to any statement made by any individual in the course of any criminal, regulatory, or civil case initiated by a governmental or private party against such individual regarding that individual's personal conduct.

13.   **Sales or Mergers**:   Barclays agrees that if it sells, merges, or transfers all or substantially all of its business operations or assets as they exist as of the execution of this Agreement to a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale, merger, or transfer a provision binding the purchaser/successor/transferee to the obligations described in this Agreement.  Any such provision in a contract of sale, merger, or transfer shall not expand or impose additional obligations on Barclays as they relate to Paragraph 6 of this Agreement.

14.   **Conduct Covered by Agreement**:   It is further understood that this Agreement does not relate to or cover any conduct by Barclays other than for any act within the scope of the Factual Statement and this Agreement.

15.   **Public Filing**:   Barclays and the United States agree that, upon acceptance by the United States District Court for the District of Columbia, this Agreement (and its attachments) and an Order deferring prosecution shall be publicly filed in the United States District Court for the District of Columbia.

12

16.   **Complete Agreement**:   This Agreement sets forth all the terms of the Agreement between Barclays and the United States.   There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon Barclays or the United States unless signed by the United States, Barclays' attorneys, and a duly authorized representative of Barclays.   This Agreement supersedes any prior promises, agreements, or conditions between Barclays and the United States.   Barclays agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.

**[REST OF THE PAGE IS INTENTIONALLY BLANK]**

**Acknowledgment**

I, the duly authorized representative of Barclays (the "Bank") hereby expressly acknowledge the following: (1) that I have read this entire Agreement as well as the other documents filed herewith in conjunction with this Agreement, including the Information and Factual Statement; (2) that I have had an opportunity to discuss this Agreement fully and freely with the Bank's attorneys; (3) that the Bank fully and completely understands each and every provision of this Agreement; (4) that the Bank is fully satisfied with the advice and representation provided by its attorneys; (5) that I am authorized, on behalf of the Bank, to enter this Agreement; and (6) that the Bank enters this Agreement knowingly and voluntarily.

Barclays Bank PLC

DATE:  _8/16/10_     _____

Mark Harding
Group General Counsel

*Counsel for Barclays Bank PLC*

　　　We, the undersigned, are attorneys representing Barclays in this matter.   In connection with such representation, we hereby expressly acknowledge the following: (1) we have reviewed and discussed this Agreement with our client; (2) we have explained fully each of the terms and conditions of this Agreement to our client; (3) we have answered fully each and every question asked of us by our client; and (4) we believe that our client fully and completely understands all of the Agreement's terms.


_8-16-10_
DATE

David H. Braff
Sullivan & Cromwell LLP


_8-16-10_
DATE

Steven R. Peikin
Sullivan & Cromwell LLP

*On Behalf of the Government*

JENNIFER SHASKY CALVERY, Chief
Asset Forfeiture and Money
  Laundering Section


By: *[signature]*

FREDERICK REYNOLDS
TEXAS BAR 24003453
Senior Trial Attorney

KEVIN GERRITY
TEXAS BAR 24025378
Trial Attorney
Asset Forfeiture and
  Money Laundering Section
U.S. Department of Justice
1400 New York Avenue, N.W.
Washington, D.C.  20005
(202) 514-1263


Date:   August *16*, 2010

# **Exhibit 1**

## EXHIBIT 1 -- FACTUAL STATEMENT

### I.     Introduction

1.      This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution

Agreements dated August 16, 2010, between the United States Department of Justice ("DOJ")

and Barclays Bank PLC ("Barclays"), a financial institution registered and organized under the

laws of England and Wales, and between the New York County District Attorney's Office

("DANY") and Barclays.

2.      From the mid-1990s through September 2006, Barclays violated both U.S. and New York

State criminal laws by knowingly and willfully moving or permitting to be moved hundreds of

millions of dollars through the U.S. financial system on behalf of banks from Cuba, Iran, Libya,

Sudan, and Burma, and persons listed as parties or jurisdictions sanctioned by the Office of

Foreign Assets Control of the United States Department of the Treasury ("OFAC") (collectively,

the "Sanctioned Entities") in violation of U.S. economic sanctions.

3.      Barclays engaged in this criminal conduct by: (a) following instructions, principally from

banks from Cuba, Iran, Libya, Sudan, and Burma not to mention their names in U.S. dollar

("USD") payment messages sent to Barclays' branch in New York, New York (the "New York

Branch") and to other financial institutions located in the United States; (b) routing USD

payments through an internal Barclays sundry account to hide the payments' connection to

Sanctioned Entities; (c) amending and reformatting USD payment messages to remove

information identifying Sanctioned Entities; and (d) deliberately using a less transparent method

of payment messages, known as cover payments.

4.      Barclays' conduct, which occurred outside the United States, caused its New York

Branch, and other financial institutions located in the United States, to process payments that

otherwise should have been held for investigation, rejected, or blocked pursuant to U.S.

sanctions regulations administered by OFAC.[1]   Additionally, by its conduct, Barclays: (a) prevented its New York Branch and other financial institutions in the United States from filing required Bank Secrecy Act ("BSA") and OFAC-related reports with the U.S. government; (b) caused false information to be recorded in the records of U.S. financial institutions; and (c) caused U.S. financial institutions not to make records that they otherwise would have been required by law to make.

5.      In May 2006, Barclays voluntarily disclosed to OFAC four transactions that were made in violation of U.S. sanctions.  At that time, Barclays commenced a limited internal investigation into the operation and limitations of its automated filtering system and Barclays' USD transactions involving U.S. sanctioned countries and persons.  Thereafter, in November 2006, Barclays exited all USD correspondent relationships with banks subject to U.S. economic sanctions, banks headquartered in sanctioned countries, and the subsidiaries of such banks (the "Sanctioned Banks").  In 2007, after being contacted by federal and state prosecutors, Barclays agreed to cooperate fully, and broadened its review to conduct a comprehensive internal investigation and historical payment analysis covering activity and transactions from January 1, 2000 to July 31, 2007.[2]

6.      Barclays has provided prompt and substantial cooperation by sharing the results of its internal investigation with DOJ and DANY, as well as with OFAC, and Barclays' U.S. banking regulators, the Board of Governors of the Federal Reserve System and the New York State

---

[1] A rejection occurs when a financial institution rejects a funds transfer because processing the transfer would violate or facilitate an underlying transaction that is prohibited by the OFAC sanctions.  OFAC must be notified when a payment is rejected.  A blocked (or frozen) payment occurs when a financial institution identifies a payment as being made in contravention of U.S. sanctions regulations, prevents its completion (holds the payment) and notifies OFAC.  A license is then generally required from OFAC in order to release the funds.
[2] Although this factual statement summarizes the primary issues and practices reported, the parties intend it to encompass and incorporate by reference all information provided by Barclays to DOJ and DANY from August 2007 to the date of this Agreement regarding Barclays payment processing practices and systems for sanctioned entities and Barclays sanctions compliance.

Banking Department.   From the beginning of the investigation, Barclays has taken full responsibility for its conduct.

## II.      Barclays' Business Organization

7.      Barclays is a global financial services provider headquartered in London, United Kingdom, and is one of the largest banks in the world.   Barclays employs more than 144,000 people, has more than 48 million customers, and operates in more than 50 countries.   At all times relevant to this matter, Barclays was a wholly-owned subsidiary of Barclays PLC, a public limited liability company organized under the laws of England and Wales.   Barclays' home country regulator is the United Kingdom's Financial Services Authority ("FSA").   The New York Branch functioned as the primary USD clearer for all of Barclays, its affiliates, and its customers.

8.      Until November 2006, Barclays maintained correspondent banking relationships with several Sanctioned Banks.     Barclays did not, however, maintain physical branches or representative offices in Cuba, Iran, Libya, Sudan Burma, or other countries subject to OFAC sanctions.

9.      Barclays' December 31, 2009 annual report listed its annual audited consolidated net income attributable to shareholders as equalling $14.31 billion USD; and $6.76 billion USD as of December 31, 2008.   Total audited consolidated assets as of the same dates equalled $1.97 trillion USD and $2.86 trillion USD, respectively.

## III.      Applicable Law

10.      At all times relevant to this matter, various U.S. economic sanctions laws regulating financial and other transactions involving sanctioned countries, entities, and persons were in existence.   Those laws applied to transactions occurring within U.S. territorial jurisdiction.

3

OFAC promulgated regulations to administer and enforce the economic sanctions laws, including regulations for economic sanctions against specific countries, entities, and individuals, including Specially Designated Nationals ("SDNs").[3]

***Cuba Sanctions***

11.     Beginning with Executive Orders and regulations issued at the direction of President John F. Kennedy, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations.   These laws, restricting U.S. trade and economic transactions with Cuba, were promulgated under the Trading With the Enemy Act ("TWEA"), 50 U.S.C. app. §§ 1-44.  These laws are generally administered by OFAC, and prohibit virtually all financial and commercial dealings with Cuba, Cuban businesses, and Cuban assets.

12.     Unless authorized by OFAC, U.S. persons are prohibited from engaging in financial transactions involving or benefiting Cuba or Cuban nationals.  This prohibition includes all "transfers of credit and all payments" and "transactions in foreign exchange."  31 C.F.R. § 515.201(a).  Further, unless authorized by OFAC, U.S. persons are prohibited from engaging in transactions involving property in which Cuba or Cuban nationals have any direct or indirect interest, including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States."  31 C.F.R. § 515.201(b).  The Cuban Assets Control Regulations also prohibit any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations.  31 C.F.R. § 515.201(c).

---

[3] SDNs are individuals and companies owned or controlled by, or acting on behalf of, countries subject to U.S. sanctions.  SDNs can also be individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under programs that are not country-specific.

*Iran Sanctions*

13.     In 1987, President Ronald W. Reagan issued Executive Order No. 12613, which imposed a broad embargo on imports of Iranian-origin goods and services.   United States sanctions against Iran were strengthened in 1995 and 1997, when President William J. Clinton issued Executive Order Nos. 12957, 12959, and 13059.   These Executive Orders prohibit virtually all trade and investment activities between the United States and Iran, including but not limited to broad prohibitions on: (a) the importation into the United States of goods or services from Iran; (b) the exportation, sale, or supply of goods, technology or services from the United States or by a U.S. person to Iran; (c) trade-related transactions with Iran by U.S. persons, including financing, facilitating, or guaranteeing such transactions; and (d) investment by U.S. persons in Iran or in property owned or controlled by Iran.   With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Iranian sanctions generally prohibit the export of services to Iran from the United States.

*Libya Sanctions*

14.     On January 7, 1986, President Reagan issued Executive Order No. 12543 imposing broad economic sanctions against Libya.   Subsequently, President Reagan issued Executive Order No. 12544 on January 8, 1986, ordering the blocking of all property and interests in property of the Government of Libya.   President George H. W. Bush strengthened those sanctions in 1992, pursuant to Executive Order No. 12801.   On September 22, 2004, President George W. Bush issued Executive Order No. 13357, terminating the national emergency with regard to Libya and revoking the sanction measures imposed by the prior Executive Orders.

***Sudan Sanctions***

15.     On November 3, 1997, President Clinton issued Executive Order No. 13067 imposing a trade embargo against Sudan and blocking all property, and interests in property, of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412. Under these Executive Orders, virtually all trade and investment activities between the United States and Sudan is prohibited, including but not limited to broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a U.S. person to Sudan; and (c) trade- and service-related transactions with Sudan by U.S. persons, including financing, facilitating, or guaranteeing such transactions. The Executive Orders further prohibit "[a]ny transactions by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese sanctions generally prohibit the export of services to Sudan from the United States.

***Burma Sanctions***

16.     On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

17.     On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta. To implement the BFDA and to take additional steps, President Bush issued Executive Order No. 13310 on July 28, 2003, which blocked all property and interests in property of certain

listed Burmese entities[4] and provided for the blocking of property and interest in property of other individuals and entities meeting the criteria set forth in Executive Order No. 13310. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located.  The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

### *Department of Justice Charges*

18.    DOJ alleges, and Barclays admits, that Barclays' conduct, as described herein, violated TWEA.  Specifically, Barclays violated 50 U.S.C. app. §§ 5 and 16, which makes it a crime to willfully violate or attempt to violate any regulation issued under TWEA, including regulations restricting transactions with Cuba.  DOJ further alleges, and Barclays admits, that Barclays' conduct, as described herein, violated the International Emergency Economic Powers Act ("IEEPA").  Specifically, Barclays violated 50 U.S.C. § 1705, which makes it a crime to willfully violate or attempt to violate any regulation issued under IEEPA, including regulations restricting transactions with Iran, Libya, Sudan, and Burma.

### *New York State Penal Law Charge*

19.    DANY alleges, and Barclays admits, that Barclays' conduct, as described herein, violated New York State Penal Law Sections 175.05 and 175.10, Falsifying Business Records in the First Degree and Second Degree, which make it a crime to:

> with intent to defraud . . . (i) make or cause a false entry in the business records of an enterprise . . . or (iv) prevent the making of a true entry or cause the omission thereof in the business records of an enterprise.

---

[4] President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked.

Under the Penal Law, it is a felony when, as here, a person or entity commits Falsifying Business Records in the Second Degree and the person's or entity's "intent to defraud includes an intent to commit another crime or to aid or conceal the commission of a crime."

## IV. Scope of Conduct

20.     For more than a decade, Barclays knowingly and willfully engaged in conduct and practices outside the United States that caused its New York Branch and other financial institutions located in the United States to process payments in violation of U.S. sanctions.  To hide these illegal transactions, Barclays altered and routed payment messages to ensure that payments violating IEEPA, TWEA, and OFAC regulations cleared without difficulty through its New York Branch and other U.S. financial institutions.   The total value of prohibited transactions for the period of Barclays' review was approximately $500 million.

## V.     Payment Processing

21.     Barclays is a member of the Society for Worldwide Interbank Financial Telecommunications ("SWIFT") and has historically used the SWIFT system to transmit international payment messages[5] with financial institutions around the world.

22.     Barclays originally processed USD payment messages through numerous global locations.  During the relevant time period, Barclays consolidated its USD payment processing so that the payments were predominately processed at Barclays' Payment Processing Centre in Poole, England ("Poole").

23.     International transfers of USD were routed through the United States in two ways using SWIFT Message Types ("MT"): (a) via a serial payment (MT 103 for customer payments and

---

[5] A SWIFT payment message is a method of transmitting payment settlement instructions for financial transactions.

MT 202 for bank-to-bank payments); or (b) via a cover payment (MT 103 plus a separate MT 202).

24.   A serial payment begins with the originating bank and is sent through the correspondent bank(s) until ultimately reaching the beneficiary bank. An MT 103 payment message requires, among other information, that the ordering and beneficiary customers be identified and transmitted from one financial institution to another throughout the entire transaction.

25.   A cover payment differs from a serial payment in that an MT 103 message is sent directly from the originating bank to the beneficiary bank and the originating bank simultaneously sends an MT 202 cover payment message to the related correspondent banks. Thus, the payment is bifurcated into two message paths. The MT 103 containing identifying information for the originator and beneficiary is sent directly to the beneficiary bank, while the MT 202, which travels through the correspondent banks, does not necessarily identify the originating and beneficiary parties. When both the originating and beneficiary banks are foreign (i.e. non-U.S.), the MT 103 for a USD payment message is not sent through or to a U.S. financial institution. Only the MT 202 is sent through the United States. Because the MT 202 payment message lacks the payment details of an MT 103, the intervening U.S. correspondent banks will not know whether the payment message involves a sanctioned entity.[6]

## VI.   Payment Practices in Violation of U.S. Sanctions Laws

26.   During the relevant time period, Barclays knowingly and willfully engaged in conduct that caused its New York Branch and other financial institutions in the United States to process payments in violation of U.S. sanctions. As part of this effort to evade U.S. sanctions, Barclays: (a) followed instructions from certain Sanctioned Entities not to mention their names in USD

---

[6] Effective November 21, 2009, SWIFT guidelines require that cover payments be made by use of an MT 202COV, which discloses both the originator and beneficiary information when there is an underlying MT 103.

payment messages sent to the New York Branch and to other financial institutions located in the United States; (b) routed USD payments through an internal Barclays sundry account, thereby hiding the payments' connection to Sanctioned Entities; (c) amended or reformatted USD payment messages to remove information identifying Sanctioned Entities; and (d) re-sent messages as cover payments to take advantage of cover payments' lack of transparency.

27.     Barclays did not market services to or solicit business from Sanctioned Entities on the basis of these payment practices.

28.     After passage of the Patriot Act in 2001, Barclays reviewed its correspondent banking practices and identified certain of its practices as problematic.  Despite this review, Barclays did not begin to take effective action until 2006.  Further, prior to mid-2006, Barclays did not train its non-U.S. employees regarding Barclays' obligations under U.S. sanctions law and did not formulate or circulate any meaningful policy regarding the OFAC regulations and their requirements.

*(A) List of Correspondents*

29.     The List of Correspondents ("LOC") was a Barclays' payment operations manual containing instructions on how to process payments for both sanctioned and non-sanctioned banks with which Barclays had correspondent relationships.[7]  As early as November 1987, Barclays received instructions from Sanctioned Banks directing Barclays not to mention their names on payment messages sent to the United States.  For example, in a November 1987 Head Office Circular, Barclays distributed payment instructions received from an Iranian bank asking Barclays "to amend the procedures governing the transfer of U.S. Dollars for any purpose in favour of our London branch" and to route such payments "without mentioning the name of our bank."  The reason for, and effect of, these instructions was to disguise sanctioned entity

---

[7] The majority of the LOC contained typical routing instructions that are not the subject of this investigation.

payments from Barclays' correspondents in the United States so that such correspondents would unwittingly process the illegal payments.

30.    Barclays' employees followed the instructions in the LOC when processing USD payments involving Sanctioned Banks, thereby ensuring that the name of the bank would not appear in any MT 202 cover payment messages sent to the New York Branch.  For example, with regard to USD payments sent on behalf an Iranian bank, the LOC stated, "[t]he cover MT202 for the direct Payment Order to be arranged by the remitting Bank <u>without mentioning</u> <u>[the Iranian bank's]</u> name . . . ." (emphasis in original).  The LOC also contained instructions to contact the remitter or beneficiary for routing instructions for certain payments involving Sanctioned Entities. The general instructions for Iranian banks stated:

> USD PAYMENTS TO IRAN
> Certain payments may be blocked by the US Authorities. Therefore any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

The general instructions for Cuba stated:

> USD PAYMENTS TO CUBA
> Certain payments may be blocked by the US Authorities. Therefore, any branch with a USD transfer is advised to contact the remitter beneficiary or beneficiary's bankers to request specific routing instructions.

31.    In 2001, Barclays prepared a memorandum regarding the LOC instructions.   The memorandum stated in relevant part that:

> For Iran and Libya the published internal procedures include directions to make transfers in US dollars which circumvent constraints and breach OFAC sanctions.  Instructions for Iraq and Cuba are less prescriptive but would nevertheless constitute a 'work around'.

Outside counsel advised Barclays that entries for Iranian and Libyan banks should be removed in favor of the following: "Only the information required by the transfer documents and no extraneous information should be provided." Additionally, Barclays was advised by outside counsel to insert certain warning language pertaining to Cuban USD transactions. The recommendation stated: "Barclays UK Operations should not make any payment or provide any facility relating to Cuba through the US or involving a US person." (emphasis in original).

### (B) Sundry Accounts

32.    A sundry account is a bank's internal suspense account typically used for the legitimate purpose of recording miscellaneous items until an appropriate account entry is determined. Barclays, however, knowingly routed sanctioned payments through Barclays' own sundry accounts, thereby disguising the true originator of USD payments. The effect of using the sundry account was that the New York Branch would believe a payment was originating from Barclays when in reality it was from a sanctioned entity. This ensured that the transaction would evade detection and would be processed by the New York Branch without question or scrutiny.

### (C) OFAC Filter

33.    The New York Branch maintained an automated filter that screened incoming payment messages against an OFAC list of sanctioned countries, entities, and individuals.[8] This software was designed to identify potential positive matches to OFAC-sanctioned entities in USD payment messages being routed through the New York Branch. Payments received by the New York Branch involving Sanctioned Entities would have been subject to investigation by the bank and then, depending on the results of the investigation, permitted, rejected, or blocked.

---

[8] OFAC regularly publishes a wide-ranging list of SDNs or targeted countries subject to U.S. sanctions. The list includes names of individuals, institutions, their variations, and, if known, addresses, dates of birth, passport numbers, and other identifying information.

34.    Poole also maintained an automated filter.   This filter screened outgoing payment messages to the United States against an OFAC list.  However, the stated function of the OFAC filter in Poole was to identify Sanctioned Entities in USD payment messages before the messages reached the United States, and as one employee emailed, to prevent "the seizure of funds in the USA."  Barclays was only concerned about USD payment messages when they were being routed to the United States.  Therefore, in the case of a cover payment, the Poole filter screened only the outgoing MT 202 payment message to the New York Branch.  Poole did not screen the related MT 103 containing the Sanctioned Entity's information that was sent by Barclays to the non-U.S. beneficiary bank.

35.    Barclays' standard operating procedures allowed and even educated its employees how to bypass both Poole's and the U.S. financial institution's OFAC filters to permit illegal payments. Pursuant to these procedures, when the Poole filter identified a payment message that contained a reference to an OFAC-sanctioned entity, that payment message was stopped for further review by Barclays' employees at Poole.  If those employees found that the payment message contained a reference to a sanctioned entity, they would follow one of the following procedures: (i) return the payment message to the remitting area via a pre-formatted fax cover sheet; (ii) alter or delete fields in the SWIFT message; or (iii) change the routing of the payment message from a serial payment to a cover payment in order to hide any connection to the sanctioned entity.

### (i) The Fax Cover Sheet

36.    Consistent with bank procedure when a payment was flagged by the Poole OFAC filter, Barclays' employees would generally return the flagged payment message to the original remitting bank.  Barclays' employees would use a specific fax cover sheet to advise the remitting area of Barclays that the payment message had been cancelled and would further identify the

13

specific words in the payment message that had caused the message to be stopped by the Poole filter. The fax cover sheet contained the following:

> OFAC ITEM: Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

Subsequently, because Barclays was advising the remitting bank of the prohibited language, some of these payment messages would be re-sent by the remitting bank without the offending language. This enabled the payment message to now pass cleanly through the Poole filter and then be processed by the New York Branch and other unwitting U.S. financial institutions.

37.    In November 2001, the use of the fax cover sheet was identified by internal audit as problematic because "without adequate guidance the recipient of the fax advice may not be aware of the implications and may merely remove the offending text and re-submit the payment without any wider consideration." In early 2002, as a result of this audit report, the language of the fax template was re-worded in an attempt to mitigate these issues. The fax language was changed to:

> OFAC ITEM: Wording below is contained in the message and does not comply with the U.S.A. / U.K. / E.C. / U.N. Sanctions.

38.    Despite the altered wording in the fax cover sheet, no implementing guidance was circulated, and the practice of stating the offending text nevertheless continued, as did the resubmission of prohibited OFAC-sanctioned transactions with the offending text removed.

### (ii) Alteration of SWIFT Message Data

39.    Barclays intentionally altered SWIFT messages when a sanctioned entity was named in the payment message and when the payment message contained an explicit instruction not to mention the name of the Sanctioned Bank when making the USD payment via the United States.

In both of these instances, Barclays' employees knew that if these payment messages were sent in an unaltered form, they would be stopped and potentially blocked or rejected in the United States because of the information contained in the message. The employees removed the problematic references and the altered payment messages were sent to U.S. financial institutions.

### (iii) Cover Payment Messages

40.    Another practice Barclays developed to ensure that sanctioned transactions would be processed through the United States was to change the routing of the payment. Barclays routinely cancelled serial payment messages being routed through the United States that contained references to a sanctioned entity, knowing that the message could be blocked or rejected in the United States. These cancelled payment messages were resubmitted using the cover payment method. By using this bifurcated payment method, Barclays was able to disguise the beneficiary and ordering customer information from the New York Branch and other U.S. correspondent banks. Barclays would thereby successfully route prohibited transactions through the United States.

41.    Internal correspondence shows that Barclays was aware of and accepted the fact that cover payments were being purposely used to hide the identity of sanctioned parties so that the bank could continue to process payments involving Sanctioned Entities through the New York Branch. For example, one Barclays employee explained in an email:

> [W]e can get around [OFAC seizure] by sending only cover payments to US banks and then make MT103 direct to beneficiary's bank. The MT202 cover must not mention of [sic] the offending entity which could cause funds to be seized. A good example is Cuba which the US says we shouldn't do business with but we do.

Barclays' employees understood the advantage of using cover payments. The cover payment, with its limited information fields, was a better mechanism to process OFAC-prohibited

transactions than using a more detailed serial payment. An employee noted in an email: "If we were to route the payment via the serial payment method . . . the payment would clearly be seized by the US authorities" but by using cover payments, "the US Treasury [would] remain blissfully unaware of [the payment's] existence."

42.     In October 2001, after a Sudanese payment was stopped, Barclays received a warning from its New York Branch that cover payments were potentially being misused. The New York Branch warned Barclays UK:

> This is a clear example of how foreign banks circumvent the OFAC Regulations by sending direct MT100s to non-US paying banks and the USD cover via the US correspondent bank. [The Sudanese] Bank is clearly a blocked entity under the Sudan sanctions.

43.     Despite this warning from its own New York Branch, Barclays continued disguising sanctioned payments and routing them through its New York Branch until early- to mid-2006. Throughout this time, Barclays was aware of the process and its effect. For example, in December 2002, internal correspondence described the use of cover payments, stating:

> To cicumvent [sic] US legislation, [Barclays is] currently rout[ing] US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York, naming only the account holding bank. A direct MT103 is them [sic] sent to the account holding bank...Further investigation suggests that we are carrying out this practice on behalf of four [Iranian bank] customers . . . .

44.     In January 2003, a Barclays manager responded:

> I am aware of this procedure but we have not encouraged anyone to use it. The banks mentioned maintain accounts with us and it is the only way, of which I am aware, to make USD payments. This method also applies to Sudan and Libya and outside the middle east to Cuba.

45.     In July 2004, an internal assessment of Barclays' payments processing explained:

> Cover payments are an issue for this project as they are effectively
> a way of by passing [sic] sanctions. . . . There is nothing in these
> payment messages [MT103 and MT202] that identifies them as
> linked for the purpose of screening.

46.     In April 2005, Barclays recognized the risk of using cover payments rather than serial

payments, which contain full beneficiary details. The risk impact was noted in an internal memo:

> Changing to different message types would be much more
> expensive to us.  Moral risk exists if we carry on using cover
> payments but that is what the industry does.  I[n] M[y] H[umble]
> O[pinion] we should carry on using cover payments and accept
> that there is a risk of these being used on occasion to hide true
> beneficiaries (who may or may not be sanctioned individuals or
> entities).

47.     In the spring of 2006, Barclays' senior management learned that four cover payments

involving sanctioned parties had been routed through the New York Branch and were processed

because the cover payments did not mention the sanctioned beneficiary or originator.  Barclays'

current management immediately made a voluntary disclosure regarding these payments to

OFAC and to its banking regulators.  Soon thereafter, Barclays was contacted by DOJ and

DANY.

## VII.    Cooperation and Remediation

48.     Barclays has fully acknowledged and accepted responsibility for its conduct. Barclays

undertook a voluntary and comprehensive internal review of its historical payment processing

and sanctions compliance practices.  As part of its review, Barclays interviewed more than 175

current and former employees and reviewed more than one hundred million records, including

hard copy and electronic documents.  The review identified the practices described above,

including the use of the LOC, the practice of altering payment instructions and omitting the

names of Sanctioned Entities from payment messages, and the use of the sundry account.

Barclays reported all of its findings in a timely manner to DOJ, DANY, and to the regulatory authorities in the United States and the United Kingdom.

49.     During the course of investigations by DOJ, DANY, and other authorities, Barclays has provided prompt and substantial cooperation including the following:

      a.     Committing substantial resources, including, but not limited to, external consultants, numerous high level Barclays' employees, and an extensive document retention program, in order to conduct a thorough investigation;

      b.     Providing timely and detailed reports of the Bank's investigation;

      c.     Conducting an extensive review of customer records and SWIFT transactions, including the review of incoming and outgoing USD payments and trade finance transactions processed by Barclays between January 1, 2000 and July 31, 2007, to identify transactions that may have violated U.S. sanctions laws;

      d.     Conducting extensive data analysis, document review, and interviews to identify the practices discussed above;

      e.     Agreeing to toll any applicable statutes of limitation; and

      f.     Making current and former Barclays' employees available for interviews by DOJ and DANY.

50.     Barclays has taken voluntary steps to enhance and optimize its sanctions compliance programs by:

      a.     Voluntarily terminating relationships with Sanctioned Banks and entities;

      b.     Committing substantial personnel and resources to sanctions compliance programs, including appointing a senior employee to oversee sanctions screening processes and to ensure operational compliance with applicable sanctions laws;

c.     Enhancing its USD payment filtering systems;

d.     Designing and providing sanctions training to more than 130,000 employees, including intensive training to more than 800 specialist employees, and ensuring that sanctions training is incorporated in training for new employees;

e.     Creating a new enhanced sanctions compliance policy that includes a general prohibition of transactions on behalf of SDNs in all currencies;

f.     Undertaking an extensive internal audit of its sanctions compliance programs in 2008 and reporting the results to interested authorities, including DOJ and DANY;

g.     Committing to conduct regular further audits of sanctions compliance issues; and

h.     Ensuring that U.S. sanctions compliance is reported to the most senior executives of the Bank.