# EXHIBIT C



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

MUL-488066

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made by and between the U.S. Department of the Treasury's Office of Foreign Assets Control and Barclays Bank PLC.

## I.    PARTIES

1.    The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic sanctions against targeted foreign countries, regimes, terrorists, international narcotics traffickers, and persons engaged in activities related to the proliferation of weapons of mass destruction, among others. OFAC acts under Presidential national emergency authorities, as well as authority granted by specific legislation, to impose controls on transactions and freeze assets under U.S. jurisdiction.

2.    Barclays Bank PLC ("Barclays") is a financial institution registered and organized under the laws of England and Wales. The United Kingdom's Financial Services Authority ("FSA") is Barclays' primary regulator.

## II.    FACTUAL STATEMENT

3.    On May 22, 2006, Barclays voluntarily self-disclosed to the Federal Reserve Bank of New York, the New York State Banking Department (collectively, the "Supervisors"), OFAC and the FSA that Barclays, New York ("Barclays NY") had processed three apparent violations of the Sudanese Sanctions Regulations ("SSR") and one apparent violation of the Cuban Assets Control Regulations ("CACR"). Barclays stated that it had begun an internal investigation into "apparent deficiencies in its filtering mechanism" at its payment processing center in Poole, UK. Barclays further stated that it had engaged Deloitte & Touche LLP and Sullivan & Cromwell LLP ("Sullivan & Cromwell") to conduct a historical transactional review.

4.    Information related to these investigations and provided to OFAC by Barclays and Sullivan & Cromwell revealed a systemic pattern of conduct giving rise to apparent violations of OFAC sanctions involving Burma, Cuba, Iran, and Sudan.

5.    For a number of years up until 2006, Barclays engaged in payment processes that prevented Barclays NY and other U.S. financial institutions from identifying the involvement of U.S. sanctions targets in funds transfers processed through the United States. In order to prevent Barclays NY and other U.S. financial institutions from identifying and interdicting such payments, Barclays purposefully used Society for Worldwide Interbank Financial Telecommunication ("SWIFT") payment messages in a manner intended to obscure the identities

of OFAC-sanctioned countries and persons, and removed information from SWIFT messages that indicated a sanctioned interest in payments routed through the United States.

6.       Beginning in at least the mid-1980s, in part at the request of its correspondent banking clients that had become or were in countries that had become targets of U.S. sanctions, Barclays circulated special instructions regarding the settlement of transactions that were processed to or through the United States.  Starting in 1987, for example, Bank Melli Iran instructed Barclays to process U.S. dollar ("USD") transactions in favor of Bank Melli's London branch by referencing only Bank Melli's account number at Midland Bank PLC without referencing the name of Bank Melli.  Bank Melli further instructed Barclays to send separate instructions, which included full transaction details, to Midland Bank PLC and Bank Melli's London Branch.  In response, Barclays memorialized these instructions in a memorandum sent by its Head Office to Barclays' international offices, and, as early as the late 1990s, included them in the bank's List of Correspondents ("LOC"), which contained information related to Barclays' correspondent banking relationships and assisted Barclays' employees in effecting international payments.  Over time the LOC grew to include instructions for payments related to several of Barclays' correspondent bank clients and included instructions to use cover payments when processing USD payments to the United States, omitting the name of U.S.-sanctions targets from the payment messages so that U.S. financial institutions could not identify the sanctions nexus of the payments.

7.       Barclays also installed an interdiction filter at its payment center in Poole to identify transactions involving U.S.-sanctioned parties.  An internal document, which was distributed to Barclays' personnel and managers in several units within the bank, instructed employees at the Poole payment processing center to notify the bank's business areas by fax of cancelled payments after a payment was stopped by the filter.  The original fax template used by the Poole Control Center to notify the originating unit within Barclays of cancelled payments allowed the sender to indicate that a SWIFT message had been rejected as an "OFAC ITEM," explaining:

> Wording below is contained in the message and does not comply with the Office of Foreign Assets Control regulations applicable to all payments sent via the U.S.A. Payments to U.S.A. must NOT contain the word listed below.

The relevant business unit would then "decide whether to re-input the message without the offending text... or to fully cancel the payment order..."  The then-Senior Manager, Barclays Group Payments Industry Management, in Poole explained in an interview that if the MT202 contained beneficiary information that caused it to be stopped by the OFAC filter in the UK, that information was removed to ensure the payment was not stopped by the OFAC filter when resubmitted.  The same employee later noted that he was aware that payment operators amended payment messages in order to facilitate U.S. dollar payments to OFAC-sanctioned countries and that this was a 'common practice' in the Bank.

8.      In addition, a supervisor with Barclays' payment processing center also sometimes instructed payment operators to process payments involving sanctioned persons through a Barclays sundry account. This practice resulted in certain instances in which on outgoing payments field 52 (ordering institution) was populated with Barclays' sundry account information, making it appear as though Barclays was the remitting bank.

9.      Barclays failed to heed concerns raised by employees at least as early as 2001, when the then-Compliance Director, Business Banking sent a memorandum regarding the LOC to the then-Head of Group Compliance, copying the then-Governance Director of Corporate Banking, which stated:

For Iran and Libya the published internal procedures include directions to make transfers in US dollars which circumvent constraints and breach OFAC sanctions. Instructions for Iraq and Cuba are less prescriptive but would nevertheless constitute a 'work around.'...Substantial reputational damage could be focused on the Group should these procedures reach the public domain.

Another employee raised similar concerns to a then-Managing Director within Barclays citing a then-recent Operational Risk Assessment:

To ci[r]cumvent US legislation, [Transaction Processing] currently route US$ items for sanctioned institutions via unnamed account numbers, without mention of the sanctioned party. For customer transfers, payment cover is routed via MT202 to New York naming only the account holding bank... This could lead to severe regulatory censure by the US Treasury.

10.     A January 2004 report to the Group Risk Oversight Committee noted that a recent failure "illustrat[ed] why the whole sanctions process needs to be reviewed and brought up to date." A July 2004 assessment of Barclays' payments processing, which was distributed to various personnel within Barclays, including to the then-Head of the Poole Payments Centre, noted: "Cover payments are an issue for this project as they are effectively a way of by passing sanctions..." Although Barclays later adopted a revised Group Sanctions Policy, the then-Chief Operating Officer conceded that Barclays had failed to develop a clear sanctions policy with detailed project plans in place for every business in every country until the beginning of 2006.

11.     OFAC has reason to believe that Barclays' conduct resulted in transactions prohibited by Executive Orders and/or regulations promulgated pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and the Trading With the Enemy Act ("TWEA"), 50 U.S.C. App. §§ 1-44.

12.     From on or about July 29, 2003, to on or about May 31, 2006, Barclays processed 46 electronic funds transfers, in the aggregate amount of USD 490,549.85, through financial institutions located in the United States, in some cases to the benefit of persons listed in the Annex to Executive Order 13310 of July 28, 2003 ("E.O. 13310"), in apparent violation of the

prohibitions against (i) "the exportation or re-exportation of financial services to Burma, directly or indirectly, from the United States…," 31 C.F.R. § 537.202, and/or (ii) dealing in property and interests in property that "come within the United States" of persons listed in the Annex to E.O. 13310, 31 C.F.R. § 537.201.

13.     From on or about October 10, 2002, to on or about November 16, 2005, Barclays processed a total of 61 electronic funds transfers in which the Government of Cuba or a Cuban national had an interest, in the aggregate amount of USD 6,711,798.95, through financial institutions located in the United States in apparent violation of the prohibition against "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States," 31 C.F.R. § 515.201(a).

14.     From on or about August 30, 2002, to on or about December 14, 2004, Barclays processed three electronic funds transfers, in the aggregate amount of USD 60,062.41, through financial institutions located in the United States to the benefit of the Government of Iran and/or persons in Iran, including various Iranian financial institutions, in apparent violation of the prohibition against the "exportation, … directly or indirectly, from the United States, … of any … services to Iran or the Government of Iran," 31 C.F.R. § 560.204.

15.     From on or about August 6, 2002, to on or about September 27, 2006, Barclays processed a total of 1,175 electronic funds transfers and trade finance transactions in the aggregate amount of USD 105,432,102.00, to the benefit of the Government of Sudan and/or persons in Sudan, through financial institutions located in the United States in apparent violation of the prohibitions against (i) the "exportation or re-exportation, directly or indirectly, to Sudan of…services from the United States," 31 C.F.R. § 538.205, and/or (ii) dealing in property and interests in property of the Government of Sudan that "come within the United States," 31 C.F.R. § 538.201.

16.     The apparent violations described above were voluntarily self-disclosed to OFAC within the meaning of OFAC's Economic Sanctions Enforcement Guidelines (the "Guidelines"). *See* 74 Fed. Reg. 57,593 (Nov. 9, 2009).

17.     The apparent violations by Barclays described above undermined U.S. national security, foreign policy, and other objectives of U.S. sanctions programs.

18.     Upon discovering the apparent violations, Barclays took prompt and thorough remedial action through extensive, global measures, including implementing a sanctions policy that broadly prohibits USD transactions with OFAC-sanctioned countries; implementing a revised and enhanced sanctions policy for all of the bank's business areas; and developing a Group-wide comprehensive training program, which is reviewed by internal and external counsel, specifically designed to provide targeted training according to staff function and role. Barclays also provided cooperation to OFAC by conducting an extensive look-back to identify

weaknesses in its compliance program and providing well-organized information regarding the
apparent violations in a timely fashion.

19.    OFAC had not issued a penalty notice or Finding of Violation against Barclays in
the five years preceding the apparent violations.

## III.   TERMS OF SETTLEMENT

IT IS HEREBY AGREED by OFAC and Barclays that:

20.    Barclays has terminated the conduct described in paragraphs 3 through 15 above
and has put in place, and agrees to maintain, policies and procedures that prohibit, and are
designed to minimize the risk of the recurrence of, similar conduct in the future

21.    On an annual basis, for a period of two years from the date of this Agreement,
Barclays shall conduct a review of its policies and procedures and their implementation, and an
appropriate risk-focused sampling of USD payments, to ensure that its OFAC compliance
program is functioning effectively to detect, correct, and report OFAC-sanctioned transactions
when they occur.  The review, the first of which shall commence one year after the date of this
Agreement shall be conducted by an independent consultant acceptable to the Supervisors and
the FSA.  No later than 30 days before scheduled commencement of the review, Barclays shall
submit an engagement letter acceptable to the Supervisors and the FSA that details the
independent consultant's scope of work.  The review will be conducted in accordance with
generally accepted auditing standards and the results of each review will be submitted to OFAC,
the Supervisors, and the FSA within 90 days of the first and second anniversary dates of this
Agreement.

22.    Without this Agreement constituting an admission or denial by Barclays of any
allegation made or implied by OFAC in connection with this matter, and solely for the purpose
of settling this matter without a final agency finding that a violation has occurred, Barclays
agrees to a settlement in the amount USD 176,000,000 arising out of the alleged violations of
IEEPA, TWEA, the Executive Orders and the Regulations referenced in this Agreement.
Barclays' obligation to pay such settlement amount to OFAC shall be satisfied by its payment of
a greater amount in satisfaction of penalties assessed by U.S. federal, state, or county officials
arising out of the same pattern of conduct.

23.    Should OFAC determine, in the reasonable exercise of its discretion, that
Barclays has breached its obligations under paragraphs 21 or 22 of this Agreement, OFAC shall
provide written notice to Barclays of the alleged breach and provide Barclays with 30 days from
the date of Barclays' receipt of such notice, or longer as determined by OFAC, to demonstrate
that no breach has occurred or that any breach has been cured.  In the event that OFAC
ultimately determines that a breach of this Agreement has occurred, OFAC will provide notice to
Barclays of its determination, and this Agreement shall be null and void, and the statute of

limitations applying to activity occurring on or after August 1, 2002, shall be deemed tolled until a date 90 days following Barclays' receipt of notice of OFAC's determination that a breach of the Agreement has occurred.

24.    OFAC agrees that, as of the date that Barclays satisfies the obligations set forth in paragraphs 21 through 22 above, OFAC will release and forever discharge Barclays from any and all civil liability, under the legal authorities that OFAC administers, in connection with any and all violations arising from or related to the conduct disclosed during the course of the investigation, including that described in paragraphs 3 through 11 above and the alleged violations described in paragraphs 12-15 above.

25.    Barclays waives any claim by or on behalf of Barclays, whether asserted or unasserted, against OFAC, the U.S. Department of the Treasury, and/or its officials and employees arising out of the facts giving rise to this Agreement, including but not limited to OFAC's investigation of the apparent violations and any possible legal objection to this Agreement at any future date.

## IV.    MISCELLANEOUS PROVISIONS

26.    The provisions of this Agreement shall not bar, estop, or otherwise prevent OFAC from taking any other action affecting Barclays with respect to any and all violations not arising from or related to the conduct described in paragraphs 3 through 15 above or violations occurring after the date of this Agreement.  The provisions of this Agreement shall not bar, estop, or otherwise prevent other U.S. federal, state, or county officials from taking any other action affecting Barclays.

27.    Each provision of this Agreement shall remain effective and enforceable according to the laws of the United States of America until stayed, modified, terminated, or suspended by OFAC.

28.    No amendment to the provisions of this Agreement shall be effective unless executed in writing by OFAC and by Barclays.

29.    The provisions of this Agreement shall be binding on Barclays and its successors and assigns.

30.    No representations, either oral or written, except those provisions as set forth herein, were made to induce any of the parties to agree to the provisions as set forth herein.

31.    This Agreement consists of 7 pages and expresses the complete understanding of OFAC and Barclays regarding resolution of the alleged violations arising from or related to the conduct described in paragraphs 3 through 15 above.  No other agreements, oral or written, exist between OFAC and Barclays regarding resolution of this matter.

32.     OFAC, in its sole discretion, may post on OFAC's website this entire Agreement or the facts set forth in paragraphs 3 through 15 of this Agreement, including the identity of any entity involved, the satisfied settlement amount, and a brief description of the alleged violations. OFAC also may issue a press release including this information.

33.     Use of facsimile signatures shall not delay the approval and implementation of the terms of this Agreement.  In the event any party to this Agreement provides a facsimile signature, the party shall substitute the facsimile with an original signature.  The Agreement may be signed in multiple counterparts, which together shall constitute the Agreement.  The effective date of the Agreement shall be the latest date of execution.

34.     All communications regarding this Agreement shall be addressed to:

Ori Lev                                                  Group General Counsel
Associate Director, Office of Enforcement                Barclays Bank PLC
Office of Foreign Assets Control                         1 Churchill Place
U.S. Department of the Treasury                          London, England E14 5HP
1500 Pennsylvania Ave., N.W., Annex
Washington, D.C.  20220

**AGREED:**

_____
Signature

MARK HARDING
Printed name of Barclays'
Duly Authorized Representative

GROUP GENERAL COUNSEL
Printed title of Barclays'
Duly Authorized Representative

DATED: August 12, 2010

Barbara Hammerle for
Adam J. Szubin
Director
Office of Foreign Assets Control

DATED: August 18, 2010