```
1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2      ------------------------X
       UNITED STATES OF AMERICA,      Docket No. CR 10-218
3                       Plaintiff,

4           v.                        Washington, D.C.
                                      August 18, 2010
5                                     11:50 a.m.

6      BARCLAYS BANK PLC,
                       Defendant.
7      ------------------------X
```

8       ***HEARING ON THE JOINT MOTION FOR APPROVAL OF DEFERRED
                   PROSECUTION AGREEMENT***
9          *BEFORE THE HONORABLE EMMET G. SULLIVAN*
                 *UNITED STATES DISTRICT JUDGE*
10

```
       APPEARANCES:
11     For the Plaintiff:      U.S. DEPARTMENT OF JUSTICE, Asset
                                Forfeiture & Money Laundering Section
12                             By:  Mr. Kevin B. Gerrity
                                    Mr. Frederick W. Reynolds
13                                  Ms. Jennifer Shasky Calvery
                               1400 New York Avenue, N.W.
14                             Suite 10100
                               Washington, D.C.  20135
15                             202.353.8915
                               kevin.gerrity@usdoj.gov
16                             frederick.reynolds@usdoj.gov
                               jennifer.calvery@usdoj.gov
17
       For the Defendant:      SULLIVAN & CROMWELL, LLP
18                             By:  Mr. Bruce W. Hickey
                               1701 Pennsylvania Ave., N.W.
19                             Suite 800
                               Washington, D.C.  20006
20                             202.956.7055
                               hickeyb@sullcrom.com
21
                               SULLIVAN & CROMWELL, LLP
22                             By:  Mr. Steven R. Peikin
                                    Mr. David H. Braff
23                             125 Broad Street
                               New York, NY  10004
24                             212.558.4705
                               peikins@sullcrom.com
25                             braffd@sullcrom.com
```

1    APPEARANCES:   (CONT'D)

2    ALSO PRESENT:
     BARCLAYS' CORP. REP:   Mr. Mark Dominic Harding

3

     Court Reporter:        Catalina Kerr, RPR, CRR
4                           U.S. District Courthouse
                            Room 6509
5                           Washington, D.C.  20001
                            202.354.3258
6                           *catykerr@msn.com*

7    Proceedings recorded by mechanical stenography, transcript

8    produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P-R-O-C-E-E-D-I-N-G-S

2              (11:50 A.M.; OPEN COURT; MR. MARK HARDING PRESENT

3    WITH DEFENDANT'S ATTORNEYS.)

4              THE DEPUTY CLERK:  Please remain seated and come to

5    order.  Criminal Case 10-218, United States versus Barclays

6    Bank PLC.  Would counsel please identify yourselves for the

7    record.

8              MR. GERRITY:  Good morning, Your Honor.  Kevin

9    Gerrity for the Government.  And at counsel table with me is

10   my colleague who's been here before, Frederick Reynolds, along

11   with the Chief of Asset Forfeiture and Money Laundering

12   Section, Jennifer Shasky Calvery.

13             THE COURT:  All right.  Good morning, Counsel.

14             MR. BRAFF:  Good morning, Your Honor.  David Braff

15   from Sullivan & Cromwell.  If I may introduce Mr. Harding from

16   Barclays.

17             THE COURT:  Sure.  Good morning.  Welcome.

18             MR. BRAFF:  Also, Your Honor, Mr. Hickey, who's a

19   member of the bar of this court is here today.

20             THE COURT:  All right.  Good morning.

21             MR. BRAFF:  I also move the admission of Steven

22   Peikin, my partner from Sullivan & Cromwell.

23             THE COURT:  Great.  That motion is granted.

24             MR. BRAFF:  Thank you, Your Honor.

25             THE COURT:  Counsel, you don't have to remain if
```

1   your presence is required elsewhere.  All right.  You are more

2   than welcome to.  All right.  The motion is granted.  I

3   thought there were two pending motions for pro hac vice.

4            MR. BRAFF:  Yes.  Mine you granted provisionally,

5   Your Honor.  We have submitted those papers.

6            THE COURT:  All right.  Great.  So, you ready to

7   proceed?

8            MR. GERRITY:  Yes, Your Honor.

9            THE COURT:  Let me hear from the Government.  All

10  right, we're ready to proceed.  Mr. Harding is present.  Why

11  don't you just tell me why this case is here, get some

12  background on the record and then we'll proceed with the

13  appropriate colloquy.  All right.  Good morning.

14           MR. GERRITY:  First, Your Honor, the United States

15  appears before you today seeking approval of a deferred

16  prosecution agreement and the exclusion of time under the

17  Speedy Trial Act.

18            At the outset I want to assure you that despite the

19  extremely serious nature of the criminal charges in this case,

20  the proposed DPA that you have before you, based on the

21  relevant circumstances of this case, is a fair and appropriate

22  resolution for this particular case.

23            There are two main points I would like to address

24  the Court.

25            THE COURT:  Sure.

1          MR. GERRITY:  First, the serious nature of Barclays'

2   conduct balanced with Barclays doing the right thing.  And by

3   doing the right things, I mean, first, they self-disclosed to

4   the United States Government voluntarily; second, they

5   remediated; and three, they were cooperative.

6          Also, as a second point, I'd like to discuss the

7   reasons why and specifically why this DPA is a fair and

8   appropriate resolution for this case.

9          First, it's important to underscore the serious

10  nature of the criminal conduct.  Barclays' conduct helped

11  countries and entities sanctioned in the United States --

12         THE COURT:  You talk fast like I do.  You have to

13  slow down a little bit for the benefit of the court reporter.

14         MR. GERRITY:  I apologize.

15         THE COURT:  I can always tell a fast talker.  All

16  right.  Because I have the same problem.

17         MR. GERRITY:  Yes, Your Honor.  I went to -- I grew

18  up in New York but then went to law school in Texas, so I will

19  go back to my Texas days.

20         THE COURT:  All right.

21         MR. GERRITY:  First, it's important to underscore

22  the serious nature of the criminal conduct.  Barclays' conduct

23  helped countries and entities sanctioned by the United States,

24  countries such as Cuba, Iran, Sudan, Libya, and Burma to

25  illegally move more than $500 million through the United

1  States financial institutions all while enabling the

2  sanctioned countries and entities to conceal the source of the

3  money.  This $500 million was the property of those sanctioned

4  entities, but as a financial institution, Barclays was a

5  gatekeeper.

6            THE COURT:  Is that a form of money laundering then?

7            MR. GERRITY:  No, Your Honor.

8            THE COURT:  It's not.

9            MR. GERRITY:  No, it's not, Your Honor.  The reason

10  why is because there is no SUA, the specified unlawful

11  activity has not occurred, so it wouldn't be money laundering.

12            THE COURT:  All right.

13            MR. GERRITY:  But the Bank was being used or was

14  involved with processing these payments.

15            THE COURT:  The Bank was a conduit.

16            MR. GERRITY:  The Bank was, in essence, was a

17  conduit, and as a gatekeeper, as a financial institution, the

18  Bank could have stopped this and should have stopped the

19  illegal activity but it did not.

20            Now, at the same time, while we look at what -- the

21  bad side, what they did was clearly bad, the Bank --

22            THE COURT:  It was not only bad; it was illegal.

23            MR. GERRITY:  It was illegal.  Absolutely.  It was

24  beyond bad.  It was illegal.  It's also critically important

25  to balance the criminal conduct against Barclays' actions and

1   their attempts and actual actions of doing the right thing.

2   And by doing that, again, they voluntarily self-disclosed to

3   OFAC.

4           THE COURT:  What was the motivation for that after

5   all these years?

6           MR. GERRITY:  Well, at the time, when this came

7   up -- and this is another point that I will address as well,

8   but right now, the management in the Bank was not aware of the

9   conduct that was going on.  So, the senior management did not

10  know, was not involved in this conduct.  This was involved in

11  with the payment processing.

12          So, when senior management in early spring of 2006

13  learned of this conduct, they reported it to the authorities

14  in the U.S. and then immediately engaged in starting

15  remediation, starting training and trying to fix what had

16  happened to figure out what happened in the past, and that's

17  what makes Barclays --

18          THE COURT:  All right.  But there were individuals

19  involved obviously, though, correct?

20          MR. GERRITY:  There were individuals involved,

21  certainly.  Any organization has individuals who are going to

22  have actions, but in this case, the reason why particularly in

23  2006 it came to light was because the senior management found

24  out about this and then delved into it further and reported

25  immediately to OFAC.

1          THE COURT:  What about those individuals, are they

2     being prosecuted?

3          MR. GERRITY:  Your Honor, the individuals -- before

4     the Court, obviously, we just have the entity that is here.

5     The Department of Justice -- and to address your concern, and

6     it's a concern that the Department has as well, is we want to

7     find individuals.  It makes sense, in any entity there's --

8     people make up the entity, so there has to be some

9     collective -- or there's potentially a crime that has occurred

10    with an individual.

11         THE COURT:  Right.

12         MR. GERRITY:  And we look very hard to try and find

13    that in every case that we look at to see is there someone or

14    an entity that has committed a crime.  But in this case, there

15    was -- there was not someone who we could prove to a court

16    beyond a reasonable doubt that someone had committed an

17    offense.  And with --

18         THE COURT:  There's no paper trail of $500 million

19    being funneled illegally to other countries?  I mean, senior

20    management realized this was happening.  Senior management has

21    to know who's responsible for it.  I mean, these weren't just

22    computer transfers.  Someone had to mastermind this.

23         MR. GERRITY:  And Your Honor, and from the

24    Department's perspective, you know, we certainly looked, and

25    we do look to see if there is someone, and to date, there is

1    no one that there's any charges pending, there's no one that

2    we have charges pending against.

3            So, while it's a concern -- I mean, we certainly

4    look and we try very hard to see is there an individual who's

5    violated U.S. laws and to bring that person to justice if

6    possible.

7            THE COURT:  But you agree there must have been some

8    human being who violated U.S. laws, though.

9            MR. GERRITY:  At some point, Your Honor, there

10   potentially is someone who did.  You know, the conduct had

11   been going on for a long time, and for us as the Government,

12   we did not find, to date, anyone that has met that.

13           THE COURT:  All right.  What about senior

14   management?  Any culpability there on the part of senior

15   management?

16           MR. GERRITY:  Your Honor, no.  You know, to date, we

17   do not have any culpability.  And again, senior management

18   brought up the point when it was raised to them and then did

19   the right thing and addressed that by coming towards the U.S.

20   authorities, starting the remediation process and then trying

21   to move forward and fix what had been done in the past.

22           THE COURT:  Right.  But there has to be a paper

23   trail, though.  Senior management realized, wait a minute,

24   this is criminal, this has been going on for -- this went on

25   for 12 years or so?  Or ...

1          MR. GERRITY:  Approximately.

2          THE COURT:  Approximately 12 years.  Just being an

3   outsider, it seems to me there has to be a paper trail that

4   leads to someone or individuals who were the masterminds

5   behind this elaborate scheme.  We're talking about $500

6   million.

7          MR. GERRITY:  And Your Honor, it's something I think

8   there's -- there's some -- in this instance, in trying to

9   look, you know, we put together and there's a whole --

10  Barclays' organization has, you know, approximately 140,000

11  people who work there, so there's a lot of different people.

12  And to date, you know, while again the Department of Justice

13  looked and looked for this to see if there is anything that we

14  could find, I -- you know, I hate to say I'm sorry to find

15  that there was no one, but you know, the justice -- we just

16  did not find anyone to report that there was a crime that we

17  could prove beyond a reasonable doubt.

18          THE COURT:  There's no basis to hold senior

19  management criminally responsible?

20          MR. GERRITY:  You know, unfortunately, in that

21  instance, no.  I mean, I know we looked and we see but there

22  was nothing that we could tie together, and the tying together

23  of an entity of this size, certainly for the entity, you know,

24  as you're well aware, Your Honor, could be collectively liable

25  for the acts of many different people, and I think in that

1   case, that's more what's happened here.  There's a lot of

2   different people with a lot of different things that are

3   moving parts and collectively you see --

4            THE COURT:  And again, I'm not trying to micromanage

5   what the Department of Justice is doing at all.  I just have

6   legitimate questions that I think that are appropriate to ask.

7   But in a situation like this where you can't, after proving an

8   investigation, find anyone or people responsible, criminally

9   responsible, then don't you really apply the strong arm to the

10  Bank and prosecute the Bank to the extent that you can?

11           MR. GERRITY:  Sure.  And Your Honor, I understand

12  your concern, and if I --

13           THE COURT:  It seems to me the more pressure you

14  apply to the financial institution, sometimes that pressure

15  results in the ability of the Government to locate people who

16  are criminally responsible.

17           MR. GERRITY:  And Your Honor, in this particular

18  instance -- and I understand the concern, I understand the

19  perception that the public may have in this regards and your

20  points; however, for this particular individual case of

21  Barclays, the Bank itself, as I was saying in 2006, has been

22  extremely cooperative in trying to work with, and I can walk

23  through some of the things they've done.

24           THE COURT:  Sure.  Go right ahead.  I raise the

25  questions.  It's only fair I give you a chance to respond to

1    them.

2          MR. GERRITY:  Absolutely.  In this particular case,

3    Barclays endeavored on a massive four-year investigation

4    looking not only at the actual transactions that have

5    occurred, so trying to tie together the financial aspects of

6    this, but looking into the processes that had occurred at the

7    Bank and trying to interview people.

8          I mean, in this particular instance, the Bank has

9    done over 300 interviews of approximately 175 employees that

10   are worldwide.  They've hired numerous consultants and counsel

11   and have started embarking in remediation right away, and the

12   cost to the Bank, and this is a conservative cost that the

13   Bank has reported to us, is in the past four years, over

14   $250 million they've spent on doing an internal investigation

15   and trying to remediate in various areas of the Bank as well.

16   On top of that, the Bank has reported to us that they've spent

17   hundreds of thousands of man hours in working this

18   investigation.

19         THE COURT:  In trying -- and also in trying to

20   locate individuals who were responsible?

21         MR. GERRITY:  Absolutely.

22         THE COURT:  They spent $250 million and couldn't

23   find anyone responsible.  That's just shocking, you know.  It

24   is shocking, isn't it?

25         MR. GERRITY:  I understand.  I understand.  The --

1   they also, you know, as I was saying in regards to what they

2   did, they looked at a hundred million records.  They've

3   gone --

4          THE COURT:  What about the senior management team,

5   any criminal responsibility there?  I mean, are they -- are

6   they responsible, the people who self-reported?

7          MR. GERRITY:  No, Your Honor.  In that instance,

8   when it's raised up that this happened, and in particular, in

9   these instances --

10         THE COURT:  You know.

11         MR. GERRITY:  -- where there is something that hits

12  the filter and they find out about it, they say how did this

13  happen, and then they say, oh, this is how this happened,

14  that's where it comes up.  Senior management legitimately, in

15  our -- in the Government's, you know, trying to prod and look

16  for these things, determined they really didn't know.

17         So, you know, but for the Bank themselves, the

18  things that they did, you know, for cooperation, I mean, they

19  went ahead, like I said, they reported to the Government.

20  They also immediately started doing remediation.  I mean, they

21  immediately went and started terminating conduct prior to DOJ

22  becoming involved.  You know, they immediately started to try

23  and cooperate once we were involved, that, as I said, reported

24  to OFAC before.

25         They, you know, committed substantial personnel and

1  resources to the sanctions compliance programs.  They now have

2  appointed -- senior employed overseas sanctioned screening.

3  They've enhanced the payment screening filters that they have,

4  and they've spent, again, a rough estimate, conservative, is

5  over $80 million to try and fix some of those things.

6           THE COURT:  Where does this money come from, the

7  money that's being spent and the money -- does it come --

8  what's the source of the money being spent, the $250 million

9  that's spent for the investigation and the $80 million for --

10          MR. GERRITY:  The 250, just to be clear, the 250

11 would encompass the 80 million, so just to be clear on the

12 record.

13          THE COURT:  Right.

14          MR. GERRITY:  Your Honor --

15          THE COURT:  Quarter of a billion dollars.

16          MR. GERRITY:  I can't from -- I can't say.  I don't

17 have the knowledge about that as to where exactly that money

18 came from.

19          THE COURT:  Does Mr. Harding know?

20          MR. HARDING:  Would come out of the Bank's own

21 profits, Your Honor.

22          THE COURT:  Comes out of the Bank's profits?

23          MR. HARDING:  Out of the Bank's profits, yes, Your

24 Honor.

25          THE COURT:  So shareholders share some risk there

 1    then, I assume.  So it comes out of -- it comes out of the

 2    depositors' pocket then.

 3              MR. HARDING:  Out of the shareholders' pocket, Your

 4    Honor.

 5              THE COURT:  The shareholders, right.  So, someone

 6    owns stock in Barclays then, it comes out of that person's

 7    pocket.  Which is a legitimate question, why should the

 8    shareholders have to pay for the Bank's irresponsibility?  I

 9    don't understand that.

10              Do you have an answer to that?  Why should the

11    shareholders have to pay for this venture?  If I own stock,

12    why should I have to pay for this, as opposed to it coming

13    from some other source like maybe the senior management team's

14    assets?

15              MR. BRAFF:  Your Honor, I'll address that.

16              THE COURT:  Sure.  Why don't you come to the mic.

17              MR. BRAFF:  The problem that developed and that was

18    reported by the Bank --

19              THE COURT:  And for the record, I don't own any

20    stock in Barclays.  I was just using that as a hypothetical.

21              MR. BRAFF:  But you know, was obviously immediately

22    taken very seriously by the current senior management of the

23    Bank, and as has been said by counsel for the Government,

24    reported and dealt with swiftly and intensively.

25              It was treated as a corporate problem that needed to

1   be gotten to the bottom of, dealt with effectively and

2   resolved.  And that, yes, Your Honor, was expensive.  The --

3          THE COURT:  Why should the shareholders have to pay

4   for that?  Why -- you know, the people that saved their money

5   to buy stock in this financial institution and they're called

6   upon to pay for this?

7          MR. BRAFF:  Well, you know, maybe it would be

8   helpful for me to, if it pleases the Court --

9          THE COURT:  Sure.

10         MR. BRAFF:  -- to address the question of how, you

11  know, these practices came to light.  These were practices

12  essentially that developed -- the record, I think, in the

13  investigation shows -- through at the payment processing level

14  through a series of practices that were developed in response,

15  we believe, based on our investigation, to customer requests

16  for transferring of funds.

17         And this is not justifying what happened at all.

18  I'm just trying to explain why --

19         THE COURT:  Sure.

20         MR. BRAFF:  -- it is that it appears that by and

21  large the practices in question that are what forms the basis

22  of this deferred prosecution agreement were practices that

23  developed at the lower levels of the Bank, and indeed when the

24  current senior management learned of them, they were -- they

25  were dealt with, and certainly, in our view, responsibly but,

 1   you know, but intensively.

 2            THE COURT:  Sure.  Account transfers then, correct?

 3   Is that what you said, account transfers?

 4            MR. BRAFF:  The processing of payments, essentially,

 5   done by --

 6            THE COURT:  Wouldn't it be easy to track who was

 7   responsible for making those transfers?

 8            MR. BRAFF:  Well, it certainly, with respect to an

 9   individual payment, you can look and see who the payment

10   processors were and the like.

11            THE COURT:  Right.

12            MR. BRAFF:  We spent many years on the subject of

13   which processors were responsible for which payments and how

14   those practices might have developed and who might have known

15   about them, and you can imagine, after 300 interviews, we have

16   a lot of information about how --

17            THE COURT:  And you turned over all that information

18   to the Government?

19            MR. BRAFF:  Yes, Your Honor.

20            THE COURT:  The United States Government?

21            MR. BRAFF:  Yes, Your Honor.

22            THE COURT:  So, you were able to identify some

23   potential people involved in this.

24            MR. BRAFF:  Well, we identified plenty of potential

25   individuals at the lower levels of the Bank who had

1    involvement in payments processing.

2              THE COURT:  Right.

3              MR. BRAFF:  That's a different question than whether

4    there was any criminal intent.

5              THE COURT:  No, I understand.

6              MR. BRAFF:  We did provide the Government with all

7    of that information, and indeed, the Government then conducted

8    its own interviews and did its own independent investigation

9    of those witnesses.

10             THE COURT:  All right.

11             MR. BRAFF:  Thank you, Your Honor.

12             THE COURT:  Let me ask you this.  Now, the 200 --

13   I'm fast-forwarding just a little bit, but there is a -- part

14   of this Deferred Prosecution Agreement provides for the

15   payment of I think $298 million to the United States, and I

16   have the same question, who pays that?  Does that come out of

17   the shareholders?

18             MR. BRAFF:  That comes out of company profits which

19   would ultimately be borne by the shareholders, yes, Your

20   Honor.

21             THE COURT:  Shareholders.  There's no alternative

22   source of income to pay this?

23             MR. BRAFF:  No, Your Honor.

24             THE COURT:  The shareholders pay for this.  All

25   right.  So it's just a risk of investment then?

1            MR. BRAFF:  Yes, Your Honor.

2            MR. GERRITY:  And with that, Your Honor, without

3    going too far adrift on what could happen.

4            THE COURT:  Sure.

5            MR. GERRITY:  I don't know, you know, from the

6    perspective of the shareholders, if any -- and any time that

7    an organization is fined or there's a forfeiture or there's

8    something that occurs, that comes out of profits which is

9    going to come out from the shareholders just as a matter the

10   of course.

11           THE COURT:  I understand.

12           MR. GERRITY:  So...

13           THE COURT:  All right.

14           MR. GERRITY:  And whether the shareholders have any

15   legal action afterwards, that's another story.

16           THE COURT:  But --

17           MR. GERRITY:  Hopefully not before today.

18           THE COURT:  Are there shareholder lawsuits pending

19   against the corporation?

20           MR. BRAFF:  No, Your Honor.

21           THE COURT:  Okay.  Thank you.  Go right ahead,

22   Counsel.

23           MR. GERRITY:  Thank you, Your Honor.

24           So, Your Honor, the -- when we look and are looking

25   to see what we should do in this particular case, and

1    understanding Your Honor's concerns about individuals and

2    looking at the scope and how do you deal with these cases and

3    the shareholders' concerns, you know, the Department as a

4    whole, and I'd like to just walk through some of the factors

5    that we look at, is that --

6           THE COURT:  Well, you know, these are shocking

7    charges, too.  I mean, what the Bank is charged with is doing

8    business with the enemy.  That's a shocking charge for a

9    United States judge to be presiding over.  You're talking

10   about, what, Iran and other countries that there were

11   prohibitions that everyone in the banking community was aware

12   of, right?

13          MR. GERRITY:  Correct.

14          THE COURT:  Yeah.  So, I'm just trying to find out

15   just what happened here.  It's a very serious charge.  Agree?

16          MR. GERRITY:  Oh, absolutely, Your Honor, it's a

17   very serious charge.  And --

18          THE COURT:  And you don't believe that the

19   Government's put on the kid gloves here at all?

20          MR. GERRITY:  I do not believe that, Your Honor,

21   absolutely not.  And in that respect, we agree, I mean, 100

22   percent that this is an extremely -- they are extremely

23   serious charges.  At the same time, it's the balance of trying

24   to weight that with the actions that the Bank itself has taken

25   in this particular case in trying to remedy and do the right

1    thing and sending a message potentially to other institutions

2    or other places out there that if you do something the way

3    Barclays has and if you immediately report this when it's

4    found out and if you do the type of investigation and are

5    willing to put the resource and allocate those resources into

6    finding out what happened and further fixing what's happened

7    so that you've remediated in the process of remediation before

8    the U.S. Government comes and finds you and says, knocking on

9    your door, you know, you didn't tell us about this, that we

10   have to, I think, weigh and look and say how does this affect

11   how we work with this case.

12           The other is, you know, and deferred prosecution in

13   and of itself, as I'm sure Your Honor has looked at, I mean,

14   there are certain parameters and things that the Bank is, and

15   I'll say, on the hook for, you know, for potentially for the

16   next two years as per the terms of the agreement.

17           First, we filed in court already -- I'm sorry.  I'm

18   talking too fast again.  I apologize.  We filed in court

19   already, as you know, with you the information which we're

20   asking to be held in abeyance.  Tied to that is the terms of

21   the Deferred Prosecution Agreement.  If the Bank violates any

22   material -- or has a material breach for the terms of that

23   Deferred Prosecution Agreement, we can come back to court and

24   we will be prepared to come back to court, and one of the

25   things that the Bank has agreed to is say that factual

1    statement is admissible in court along with other things, so

2    we are going to come in and we are going to come after them.

3           So, they have something hanging over their head to

4    continue doing the remediation that they've already begun and

5    had been doing for a number of years.  And we can try and at

6    least use that as a source to say, look, here's something,

7    we're going to hang this over your head for the next two years

8    and then be able to look and see how things are going over

9    those next two years and make sure that they continue to be

10   the corporate citizens that they have been trying to be and

11   working to be over the past four years after this came -- when

12   this came to light.

13          THE COURT:  All right.  I have to say that in the 25

14   years I've been a judge, I have not seen one of these deferred

15   prosecution agreements.  The closest I've -- I'm trying to

16   think.  The type of plea agreement I've seen that's the

17   closest to this is the scenario involving individuals who

18   enter pleas of guilty to information and then there's the

19   equivalent of probation before judgment, so this is probably

20   the most analogous type of proceeding, although there's no --

21   there's no admission of criminal guilt here.

22          There's a deferral of prosecution here as opposed to

23   most individuals who plead guilty and are placed on probation

24   or supervised release for a period of time with many

25   conditions, and if they satisfactorily -- if they are

 1    satisfactory with those provisions, then a basis exists for an

 2    expungement of record or -- but there's that guilty plea,

 3    there's that criminal acknowledgment of guilt that's not here

 4    at all, and that's -- that's concerns -- that concerns the

 5    judge.

 6              I mean, there's no -- no one is being prosecuted.

 7    The likelihood of prosecuting anyone is nil.  It's not going

 8    to happen probably; fair statement?

 9              MR. GERRITY:  You know, I don't want to lose sight

10    that there's not --

11              THE COURT:  Well, you're not optimistic about

12    prosecuting anyone at this point, though, are you?

13              MR. GERRITY:  Right.

14              THE COURT:  You don't have any optimism.  All right.

15    There's no prosecution of anyone.  Shareholders, you know, it

16    comes out of the shareholders' -- off the shareholders' back

17    and out of their pockets to pay, you know, the cost of this

18    investigation, a quarter of a billion dollars, it sounds like,

19    plus another 300 million dollars, and prosecution is being

20    deferred.

21              So, they don't have to stand up here and take

22    criminal responsibility for -- for the Bank's conduct.

23              MR. GERRITY:  Your Honor, to an extent --

24              THE COURT:  And that's why -- you know, and again,

25    I'm not -- well, I'm just raising legitimate concerns that I

1    think should be raised because this -- this is atypical.  This

2    is not the way in which the Government has done business, at

3    least before me.  I don't know about my colleagues, but I'm

4    not aware of these types of -- I think in the last six months

5    or so we've seen three or four of these, and maybe we'll see

6    more, I don't know.  But that's just a concern I just wanted

7    to share with you because this is totally atypical.

8            And again, look, I can't micromanage.  It's not my

9    job to micromanage what the Department of Justice is doing,

10   but I'm just raising a concern, and I think that -- look, the

11   public has very little confidence in these so-called white

12   collar proceedings anyway.  The perception of white collar

13   crime is that no one treats individuals who commit white

14   collar crimes seriously.  You know, they come to court, plead

15   guilty, back on the subway, get home for lunch, look at the

16   soap operas, life goes on, everyone lives happily ever after,

17   people pay a fine, and they go on about their business.

18           And you know, it's proceedings like this that raise

19   concerns in the public's mind about fairness and justice and

20   why are financial institutions being treated the way in which

21   they're being treated when everyone else who is charged

22   criminally has to acknowledge criminal responsibility and

23   maybe they're placed on probation and maybe a basis exists to

24   expunge a record, but people plead guilty for their criminal

25   conduct.  But this bank is not being asked to plead guilty at

1    all.

2            MR. GERRITY:  And Your Honor, I think in -- and I

3    understand the concerns and I understand the public

4    perception.  I think there is some dynamic between the

5    individual and the entity, not to say that one should be

6    pleading guilty and one should not, but I think in the

7    corporate setting, there's some other policy or thoughts as to

8    why a deferred prosecution may in fact be a good thing for the

9    corporate end, in this case, in the financial world and that

10   other people see, and particularly in this case, that by

11   self-reporting and by doing those things --

12           THE COURT:  Can I just share a thought with you,

13   though.

14           MR. GERRITY:  Oh, absolutely, Your Honor.

15           THE COURT:  You know what, if other banks saw that

16   the Government was being rough and tough with banks and

17   requiring banking officials to stand before federal judges and

18   enter pleas of guilty, that might be a powerful deterrent to

19   this type of conduct.

20           But what you just said a few minutes ago was this,

21   if the word gets around that if you self-report, then you

22   could get an agreement like this, deferred prosecution.  You

23   know, I understand what you're saying, and maybe that is an

24   incentive for people to come forward.  I think you might have

25   a more powerful incentive, though, if you start extracting

1    some pleas of guilty from some corporate officials and banks

2    having to pay stiff fines.  The fines in these cases are what,

3    a million dollars per count?

4              MR. GERRITY:  It's a million dollars per count on

5    this.

6              THE COURT:  A million dollars per count which some

7    judge could fashion to come out of the salaries of members of

8    the board of directors as opposed to out of the pocketbooks of

9    shareholders.  I think you might see a dramatic change in how

10   the banking world does business, but it's just -- you know,

11   the public looks at this and says, you know, they're given a

12   free ride here.  They can pay for their justice, and that's

13   what -- that's what people -- that's what the average citizen

14   probably concludes looking at this.

15             Well, they've got $300 million, they don't get --

16   you know, they don't have to plead guilty -- pay $300 million,

17   they don't have to plead guilty at all, and in two years they

18   change their policies and procedures, life goes on, and the

19   shareholders have paid this.  The Bank hasn't suffered at all.

20   It comes out of the pocketbooks of average people who have or

21   thought they had a wise investment in a bank that's committed

22   criminal conduct, and what's the -- what's the loss to the

23   Bank?

24             MR. GERRITY:  Well, as the Bank, as a whole,

25   certainly, you know, with the profits being taken out, that

1    impacts the Bank.  I know it directly, you know, can impact

2    the shareholders, but it impacts the Bank, and you know, if

3    people see that, then that has a ripple effect from a -- I

4    mean from a policy standpoint.  You know, I think that --

5              THE COURT:  But, you know, I recognize it's the

6    Federal Government's carte blanche authority to charge as

7    appropriate, I recognize that, but I'm just raising some

8    questions that I think are legitimate, and I think these are

9    probably questions that the public would raise as well if they

10   had the opportunity to do so, so...

11             MR. GERRITY:  And Your Honor, it's questions that we

12   certainly ask --

13             THE COURT:  Sure.

14             MR. GERRITY:  -- in looking at these cases and how

15   to deal with these cases as well.

16             THE COURT:  All right.  As I indicated, it's the

17   first one I've seen in 26 years -- 25 years, Deferred

18   Prosecution Agreement.  We're going to see more of these with

19   banks?  Probably.  Who knows.  You think we might see any of

20   these with individuals?

21             MR. GERRITY:  I don't believe there's a mechanism,

22   Your Honor, to have this with individuals.

23             THE COURT:  Really.  Is there a statutory

24   prohibition for deferring prosecution for someone --

25             MR. GERRITY:  I'm not -- to be honest, Your Honor, I

 1   don't -- I'm not sure.  You know, if you want, I mean, I can

 2   find the answer for you.

 3               THE COURT:  Sure, it would be great.

 4               MR. GERRITY:  I can see if I can find that answer

 5   for you.

 6               THE COURT:  So this is a procedure reserved for

 7   corporations only.

 8               MR. GERRITY:  You know, to be honest, Your Honor,

 9   I'd -- rather than saying and saying something out of the sky

10   in the Court --

11               THE COURT:  I appreciate that.

12               MR. GERRITY:  No problem, Your Honor.

13               THE COURT:  Anything else?

14               MR. GERRITY:  No, Your Honor.

15               THE COURT:  All right.  Thank you.  I appreciate

16   that.  I know I pestered you with a lot of questions but I

17   thought they were legitimate questions.

18               MR. GERRITY:  They are very legitimate questions.

19   Thank you, Your Honor.

20               THE COURT:  All right.  Let me hear from Defense.

21   You want to add anything to that?

22               MR. BRAFF:  No, Your Honor.  I'm happy to answer any

23   of the Court's questions.

24               THE COURT:  All right.  Let's proceed with this, and

25   this is somewhat unique.  I'll ask Mr. Harding, he's the

1    corporate banking official representing the Bank?

2            MR. BRAFF:  Yes, Your Honor.

3            THE COURT:  I'll ask him to come forward.

4            All right.  And you have to raise your right hand,

5    sir, and be sworn in.

6            (MR. MARK DOMINIC HARDING SWORN BY THE DEPUTY

7    CLERK.)

8            THE COURT:  All right.  And what's your full name

9    for the record, sir?

10           MR. HARDING:  Mark Dominic Harding.

11           THE COURT:  How do you spell your first name?

12           MR. HARDING:  Mark, M-a-r-k.

13           THE COURT:  All right.  And you are an official with

14   Barclays?

15           MR. HARDING:  I am, Your Honor.

16           THE COURT:  And what's your capacity there?

17           MR. HARDING:  I'm Group General Counsel.

18           THE COURT:  Group General Counsel.  All right.  And

19   I'm going to go through this slowly because this is somewhat

20   unusual and I want to make sure that I dot every "I" and cross

21   every "T."

22           You're authorized to speak on behalf of Barclays

23   this morning; is that correct?

24           MR. HARDING:  I am, Your Honor.

25           THE COURT:  And that's pursuant to actions by the

1    board of directors; is that correct?

2            MR. HARDING:  That's correct.

3            THE COURT:  And the Court has previously been

4    provided with a copy -- and thank you, Counsel -- of the

5    written resolutions of the Board's and the signatures of each

6    board member, and I believe that that's been filed on the

7    public docket.  If there's some personal -- actually, I should

8    have -- has that been filed electronically?

9            MR. BRAFF:  I believe it has, Your Honor, yesterday.

10           THE COURT:  All right.  If there's a need to seal

11   any of that information, if there's any proprietary

12   information.

13           MR. BRAFF:  No, Your Honor.

14           THE COURT:  All right.  That's fine.  And you have

15   the authority to speak on behalf of Barclays this morning and

16   to bind Barclays to this Deferred Prosecution Agreement.

17           MR. HARDING:  I do, Your Honor.

18           THE COURT:  What's your understanding of this

19   Deferred Prosecution Agreement?  And for the record, I believe

20   you have signed this agreement, correct?

21           MR. HARDING:  That's correct.

22           THE COURT:  Did you sign it before you read it or

23   after you read it?

24           MR. HARDING:  After I read it.

25           THE COURT:  All right.  And you were authorized by

1   the board to read it and sign it?

2          MR. HARDING:  I was.

3          THE COURT:  Essentially, what's your understanding

4   of this prosecution agreement?

5          MR. HARDING:  In brief, Your Honor, it is a

6   prosecution -- it's a deferred prosecution for a two-year

7   period during which we have certain obligations and during

8   which if we commit a breach of that, then prosecution can be

9   proceeded with.  And we have a number of obligations in the

10  agreement to cooperate and to provide documentation, to

11  provide witnesses, if necessary, during the course of that

12  period.

13         THE COURT:  All right.  Do you understand the

14  document?

15         MR. HARDING:  I do, Your Honor.

16         THE COURT:  The deferred prosecution.  Do you have

17  any questions about it?

18         MR. HARDING:  No, I do not.

19         THE COURT:  All right.  And on behalf of Barclays

20  Bank PLC, it was the intent of the Bank to bind itself to this

21  agreement?

22         MR. HARDING:  Yes, Your Honor.

23         THE COURT:  All right.  And that's pursuant to the

24  charter of the Bank and also the -- I assume this resolution,

25  written resolution of the board.

1          MR. HARDING:  Yes.

2          THE COURT:  Correct.  All right.  I'm going to go

3    through this.  Do you have a copy of this in front of you?

4          MR. HARDING:  I do not.

5          THE COURT:  All right.  I'm going to ask you some

6    questions about it because I want to make sure that you

7    understand all of the provisions of this Deferred Prosecution

8    Agreement, and if you have any questions or don't understand

9    anything, just let me know.

10          Just for purposes of background, how long have you

11    been -- I'm sorry, you're General Counsel?

12          MR. HARDING:  General Counsel.

13          THE COURT:  How long you been General Counsel?

14          MR. HARDING:  For seven years, Your Honor.

15          THE COURT:  For seven years.  All right.

16          I'm going to -- most of the plea colloquy questions

17    aren't relevant here.  I'm going to essentially get to the

18    Deferred Prosecution Agreement itself and ask you, looking at

19    page 1, there is a recitation of the charges against Barclays,

20    and part of this agreement on page 1 is that Barclays agrees

21    that it shall waive indictment and agree to the filing of a

22    two-count information in this court charging it with willfully

23    violating and attempting to violate the Trading with the Enemy

24    Act and willfully violating and attempting to violate the

25    International Emergency Economic Powers Act and regulations

1  issued thereunder.  That's in paragraph 1.  Is that your

2  understanding as well?

3          MR. HARDING:  Yes, it is, Your Honor.

4          THE COURT:  Are you familiar with those statutes?

5          MR. HARDING:  I've been advised in relation to them,

6  yes, Your Honor.

7          THE COURT:  All right.  Okay.  I will inquire of the

8  Government, what is the maximum statutory penalty that exists

9  for those charges?  I think I have an obligation to advise the

10 Defendants of that.

11         MR. GERRITY:  Yes.

12         THE COURT:  Yes, Counsel.

13         MR. GERRITY:  The maximum statutory penalty for the

14 corporation would be a fine of the $2 million for the two

15 counts as well as --

16         THE COURT:  $1 million per count?

17         MR. GERRITY:  $1 million per count and then there is

18 a potential for a probation period as well as up to five

19 years.

20         THE COURT:  Up to five years.

21         MR. GERRITY:  Correct.  And there's a special

22 assessment of $400 as well.

23         THE COURT:  All right.  Thank you.

24         MR. GERRITY:  No problem.

25         THE COURT:  All right.  Do you understand that's the

1  maximum statutory penalty that could be imposed if for some

2  reason the Government decides to prosecute Barclays; do you

3  understand that?

4          MR. HARDING:  Yes.

5          THE COURT:  Do you have any questions about that?

6          MR. HARDING:  No, I do not.

7          THE COURT:  Paragraph 2 essentially tells me that

8  Barclays has accepted and acknowledges responsibility for its

9  conduct and that of its employees as set forth in the

10 attachment, Attachment 1 to the Deferred Prosecution

11 Agreement.  You've read the Attachment 1; is that correct?

12         MR. HARDING:  I have.

13         THE COURT:  All right.  As part of this -- and I

14 should probably address this issue now.  As part of this

15 procedure, Barclays has agreed to waive speedy trial rights.

16 Essentially what that means is that Barclays has agreed to

17 give the Government more time within which to prosecute

18 Barclays should there be a breach of this plea agreement.  Do

19 you understand that?

20         MR. HARDING:  Yes.

21         THE COURT:  My understanding is that the waiver of

22 time under the speedy trial clock is two years; is that

23 correct, Counsel?

24         MR. GERRITY:  Yes, Your Honor, that is correct.

25         THE COURT:  All right.  Does the Government

1    contemplate that there will be intervening status hearings in

2    this case between now and the expiration of this agreement

3    or --

4            MR. GERRITY:  Your Honor, we certainly defer to

5    whatever you would like.

6            THE COURT:  What do you recommend?

7            MR. GERRITY:  I would recommend --

8            THE COURT:  I'm going defer to you.  What do you

9    recommend?

10           MR. GERRITY:  Absolutely.  I would recommend that we

11   maybe do this in about a year.  If we could do either six

12   months or a year, I would say a year would be appropriate, but

13   if the Court prefer --

14           THE COURT:  Let me ask you this.  Barclays has

15   certain responsibilities during the interim two years.  They

16   have to change policies, procedures, et cetera; is that

17   correct?

18           MR. GERRITY:  Yes, Your Honor.

19           THE COURT:  I think it might be -- I mean, they're

20   getting quite a benefit here.  I think it might be appropriate

21   to bring them in, and we'll have Mr. Harding back, I think,

22   every three months or so just to see what progress is being

23   made as opposed to just giving them a year.  Will there be

24   some sort of monitoring of this process by anyone?

25           MR. GERRITY:  Not in the sense of a monitor as would

1    be the colloquial term for Department of Justice, a monitor,

2    but in the sense that --

3            THE COURT:  I've heard that monitors have been

4    appointed in other cases but not this case?

5            MR. GERRITY:  Not in this case.

6            THE COURT:  Is it contemplated that a monitor will

7    be appointed?

8            MR. GERRITY:  No, it wouldn't, although if you -- in

9    our Deferred Prosecution Agreement it's contemplated as one of

10   the cooperation points is that the Bank will file and abide by

11   any orders by the regulators, so in this case the Federal

12   Reserve as well as the, from the Treasury Department, the

13   Office of Foreign Assets Control, so those parties, if they

14   have anything that they want the Bank to do and they are

15   certainly well versed in the issues regarding sanctions --

16           THE COURT:  Right.

17           MR. GERRITY:  -- with the Bank, if the Bank is in

18   breach of any of those, that would be a breach for our

19   agreement.

20           THE COURT:  Right.

21           MR. GERRITY:  So, the expectation is we're going to

22   be in communication with the counsel and making sure that

23   things are following along in regards to the entire deferred

24   prosecution.

25           THE COURT:  I've heard that in one of these banking

1   cases, a former Attorney General Ashcroft was appointed to

2   essentially monitor and receive compensation in the amount of

3   $50 million, which is a staggering fee, I think, but that's

4   not going to take place in this case?

5           MR. BRAFF:  Your Honor, may I address a point which

6   is that we have some --

7           THE COURT:  I just want to get an answer to my

8   question first.

9           MR. GERRITY:  Absolutely, Your Honor.  No.  The

10  Government's intent is not to have a monitor put in place in

11  this case.

12          THE COURT:  All right.

13          MR. GERRITY:  If for some reason that changed at

14  all, you'll be the first one to know.

15          THE COURT:  Thank you very much.  I appreciate that.

16          MR. GERRITY:  Absolutely.

17          THE COURT:  I need to know that because then that's

18  our taxpayers paying that, correct?

19          MR. GERRITY:  I believe so, yes.

20          THE COURT:  Right.  All right.  Yes.

21          MR. BRAFF:  My only additional comment is that as

22  part -- as you'll see from the attachments to the resolution,

23  as part of the resolution of the overall case, there are

24  additional agencies which the Bank is entering into agreements

25  with once Your Honor, if it does enter the order, once the

1   order is entered, where there will be significant obligations

2   imposed on the Bank with respect to going forward and

3   reporting obligations to those regulators.

4           MR. GERRITY:  I just wanted to reiterate kind of

5   what my defense counsel had indicated with the regulators.  As

6   I said, with the Office of Foreign Assets Control and with the

7   Federal Reserve Bank being the regulators, and we have that

8   included in our DPA, and so, in essence, we have a lot of

9   confidence, obviously, in those --

10          THE COURT:  In the federal regulators.

11          MR. GERRITY:  In the Government, yes.

12          THE COURT:  People who get paid to do this.

13          MR. GERRITY:  Absolutely.

14          THE COURT:  I totally agree with that.

15          MR. GERRITY:  So they are the ones who, you know, in

16  essence, would be making sure that everything is going all

17  right.

18          THE COURT:  I applaud that.  It makes eminently good

19  common sense.  Great.

20          So, I need to make a finding, though, that the

21  waiver of speedy trial rights is a knowing one, and it is a

22  knowing one, correct?

23          MR. HARDING:  Yes, correct.

24          THE COURT:  It's voluntary under the circumstances.

25  No one forced you to do this, correct?

1          MR. HARDING:  That's correct.

2          THE COURT:  All right.  And it's certainly

3    consistent, I believe, with the fair administration of

4    justice, so I'll make a finding that speedy trial rights are

5    waived up through -- and let's pick a date two years from now

6    because it's contemplated that the waiver would be for a

7    two-year period; is that correct?

8          MR. GERRITY:  Yes, Your Honor.

9          THE COURT:  What date makes sense, because I'm going

10   to have status hearings every three months so I can also

11   monitor what's going on.  I think the waiver should be for the

12   two-year period so that we don't have to go through this every

13   three months.

14         MR. BRAFF:  August 18th, two years from now.

15         THE COURT:  Sounds like a good day for me, right.

16   All right.  That would be '12, right?  All right.  August

17   18th, 2012.

18         So, Carol, we'll issue -- we'll make a docket entry

19   that speedy trial rights are waived.

20         There are no objections to that, Mr. Harding?

21         MR. HARDING:  No objection.

22         THE COURT:  All right.  Speedy trial rights are

23   waived through August 18th, 2012, and I guess what we should

24   do is maybe the last status hearing should be -- actually we

25   can use that date, August the 18th, '12, and that's the --

1  that should probably be a Friday or so, isn't it?

2          THE DEPUTY CLERK:  It's Thursday.

3          THE COURT:  Thursday, because of the leap year,

4  right?  August 18th at noon then, for status hearing, 2012.

5          Now, paragraph 2 also provides that if the United

6  States, pursuant to paragraph 9 of this agreement, initiates a

7  prosecution that is deferred, Barclays agrees that it will

8  neither contest the admissibility of the factual statement,

9  reports or any other documents, nor contradict it in any such

10  proceeding.  Is that your understanding as well?

11          MR. HARDING:  Yes, it is, Your Honor.

12          THE COURT:  All right.  Barclays, pursuant to this

13  plea agreement or Deferred Prosecution Agreement, also waives

14  and foregoes any rights under the United States Constitution,

15  Rule 410 of the Federal Rules of Evidence, Rule 11(f) with the

16  Federal Rules of Criminal Procedure, or any other rule, for

17  that matter, to assert that any plea, plea discussions, and

18  any related statements made by or on behalf of Barclays should

19  be inadmissible, suppressed, or otherwise excluded from

20  evidence at any judicial proceeding.  Is that your

21  understanding as well?

22          MR. HARDING:  Yes, Your Honor.

23          THE COURT:  I don't plan to go through this word for

24  word.  You're an attorney, correct?

25          MR. HARDING:  Correct.

1           THE COURT:  You're admitted to the bar of England?

2           MR. HARDING:  England and Wales, yes, Your Honor.

3           THE COURT:  England and Wales.  All right.  What

4    about the bar of this country, United States?

5           MR. HARDING:  Not the bar of this country.

6           THE COURT:  All right.  And you've read this.

7    You're a barrister or an attorney or --

8           MR. HARDING:  I'm a solicitor, technically.

9           THE COURT:  Solicitor.  All right.  What's the

10   difference?

11          MR. HARDING:  Solicitor of the Supreme Court.

12          THE COURT:  What's the difference?

13          MR. HARDING:  What's the difference?

14          THE COURT:  Yes.

15          MR. HARDING:  Solicitor is the other branch of the

16   profession.  It is the branch of the profession that usually

17   does not appear in court, in fact.

18          THE COURT:  All right.  Welcome to the Court.  All

19   right.

20          (LAUGHTER.)

21          THE COURT:  But you've read this.

22          MR. HARDING:  I have.

23          THE COURT:  And you've been a solicitor for how many

24   years?

25          MR. HARDING:  Thirty years.

```
1           THE COURT:  Thirty years.  All right.  Paragraph 3
2   addresses the forfeiture amount, and there is a forfeiture
3   amount where Barclays hereby acknowledges in paragraph 3 that
4   at least 298 million American dollars, I assume, right?
5           MR. GERRITY:  Yes, Your Honor.
6           THE COURT:  Or pounds?
7           MR. BRAFF:  No, it's dollars.
8           MR. HARDING:  Dollars, Your Honor.
9           MR. GERRITY:  I wish it was pounds.
10           THE COURT:  Why isn't it pounds?
11           MR. GERRITY:  What's that?
12           THE COURT:  Maybe it should be pounds.
13           MR. GERRITY:  I don't know.  Is -- that the amount
14   should be pounds?
15           THE COURT:  Yeah.  You just said you wish it were
16   pounds.
17           MR. GERRITY:  No, I was making --
18           THE COURT:  Maybe in the next case it should be
19   pounds or -- Anyway.  This is the agreement.  Again, this is
20   the agreement between the United States and Barclays,
21   $298 million, American dollars be paid as a forfeiture.  You
22   understand that, correct?
23           MR. HARDING:  That's correct.
24           THE COURT:  My understanding is there's a New York
25   proceeding as well.  Are you participating in that proceeding
```

1   as well, the New York proceeding?

2          MR. HARDING:  The Bank, obviously, is, yes, Your

3   Honor.

4          THE COURT:  On behalf of the Bank.

5          MR. HARDING:  Yes.

6          THE COURT:  All right.  I need to have an

7   understanding about that.  What -- there's $149 million being

8   paid in this case; is that correct?

9          MR. BRAFF:  That's correct, Your Honor.

10         THE COURT:  Where is it -- why is it -- why is it

11  split that way?

12         MR. BRAFF:  Well, it wasn't our decision to split it

13  that way, but this was a joint investigation of the New York

14  DA's office and the Department of Justice, and the resolution

15  is a joint resolution.

16         THE COURT:  All right.

17         MR. BRAFF:  And the amount --

18         THE COURT:  Is there a separate plea proceeding

19  before a New York judge?  Everything is rolled into this one;

20  is that correct?

21         MR. BRAFF:  That agreement is dependent on the

22  outcome of this being that the order is signed.

23         THE COURT:  All right.

24         MR. BRAFF:  And once the order is signed, that

25  agreement becomes effective as well.

1          THE COURT:  All right.  Is that your understanding,

2     Counsel?

3          MR. GERRITY:  Yeah, absolutely.

4          THE COURT:  All right.  So how does that -- how does

5     that -- what happens now?  The money will be paid when?

6          MR. BRAFF:  Three business days from the signing of

7     the order, Your Honor.

8          THE COURT:  All right.  The full $298 million?

9          MR. BRAFF:  That's correct.

10          THE COURT:  All right.  And that's forfeited

11    forever, not refundable to Barclays under any conditions,

12    correct?  It will never go back to Barclays.

13          MR. GERRITY:  That's correct, Your Honor.

14          THE COURT:  All right.  All right.  Do you have any

15    questions about paragraph 3?

16          MR. HARDING:  No, Your Honor.

17          THE COURT:  All right.  Apparently there is a

18    separate Deferred Prosecution Agreement with the District

19    Attorney of the County of New York being entered into

20    contemporaneously.  I assume that's already been entered into,

21    correct?  Did you sign on behalf of Barclays also?

22          MR. HARDING:  I signed it.

23          THE COURT:  All right.  Paragraph 4 says that if

24    the -- you know, if for some reason the Court does not approve

25    this agreement in accordance with the federal code, Barclays

```
 1    and the United States are released from any obligations

 2    imposed under this agreement, and you understand that,

 3    correct?

 4              MR. HARDING:  Yes, Your Honor.

 5              THE COURT:  All right.  You have to say "yes" or

 6    "no" for the court reporter.

 7              MR. HARDING:  Yes.

 8              THE COURT:  Paragraph 5 sets forth the conditions of

 9    a deferral of prosecution.  You've read all of those

10    conditions there, 6, and do you have any questions about the

11    conditions under which this prosecution is being deferred?

12              MR. HARDING:  No, Your Honor.

13              THE COURT:  All right.  There are a number of --

14    actually there are two subsections that carry over to

15    paragraph -- strike that -- to pages 4 and 5, (i) and (ii).

16    Do you have any question about either paragraph?

17              MR. HARDING:  No, Your Honor.

18              THE COURT:  Okay.  Do you understand both

19    paragraphs?

20              MR. HARDING:  I do.

21              THE COURT:  All right.  Paragraph 6 is the

22    cooperation provision where Barclays agrees, acknowledges, and

23    understands that its cooperation with this investigation and

24    any subsequent prosecution against other entities is an

25    important and material factor underlying the decision by the
```

 1   United States to enter into this agreement.  Do you understand

 2   that?

 3           MR. HARDING:  Yes.

 4           THE COURT:  All right.  And Barclays agrees for the

 5   duration of this agreement in accordance with and subject to

 6   all United States and foreign law and to cooperate fully and

 7   honestly with the United States and agree with any other

 8   federal, state or local governmental decisions relating to the

 9   information and factual statement, correct?

10           MR. HARDING:  Yes.

11           THE COURT:  Well, in talking about the information,

12   Barclays has also agreed to a waiver of its right to be

13   indicted in this case and consented to the filing of an

14   information, a two-count information; is that your

15   understanding as well?

16           MR. HARDING:  Yes, it is.

17           THE COURT:  All right.  And do you understand that

18   Barclays, like anyone else, would have the right to have a

19   grand jury consider charges against it, but that's been waived

20   by Barclays?

21           MR. HARDING:  Yes, Your Honor.

22           THE COURT:  And you've acknowledged your -- or

23   Barclays' agreement by your signature then; is that correct?

24           MR. HARDING:  Yes, Your Honor.

25           THE COURT:  So you've given up your right to a grand

1    jury proceeding and you've also indicated and agreed on behalf

2    of Barclays to waive statutory rights for a speedy

3    prosecution.

4           Cooperation.  There are a number of paragraphs that

5    address cooperation on pages 5, 6, 7, and 8.  There are at

6    least, looks like, ten paragraphs there.  You've read each one

7    of those paragraphs.  I'm not going to go over them word for

8    word.  You've read and understand Barclays' obligation to

9    cooperate, correct?

10          MR. HARDING:  Yes, Your Honor, yes, I do.

11          THE COURT:  I'll just mention that with respect to

12   paragraph (a), do you understand everything in paragraph (a)?

13   6(a), that's at the bottom of page 5.

14          MR. HARDING:  Yes, I do.

15          THE COURT:  With respect to paragraph (b) on -- at

16   the top of page 6, do you understand everything?

17          MR. HARDING:  Yes, Your Honor.

18          THE COURT:  All right.  And (c) --

19          MR. HARDING:  Yes.

20          THE COURT:  -- refers to electronic databases that

21   Barclays has to maintain.

22          (d) refers to Barclays' obligation to completely and

23   truthfully disclose to the United States all information and

24   materials in its possession, custody, or control relating to

25   any transaction in the scope of or relating to a factual

1   statement that the Government, United States Government or its

2   agency may request.  Do you understand that?

3               MR. HARDING:  Yes.

4               THE COURT:  Paragraph (e), 6(e) -- Strike that.  (e)

5   on page 6, you understand that?

6               MR. HARDING:  Yes, Your Honor.

7               THE COURT:  And (f), paragraph (f), you've read that

8   and do you understand what's required of Barclays there?

9               MR. HARDING:  Yes, I have read it.

10              THE COURT:  Paragraph (g), do you understand

11  Barclays' obligation in paragraph (g)?

12              MR. HARDING:  Yes, Your Honor.

13              THE COURT:  And (h)?

14              MR. HARDING:  Yes, Your Honor.

15              THE COURT:  And (i)?

16              MR. HARDING:  Yes.

17              THE COURT:  Paragraph (j), do you understand that?

18              MR. HARDING:  Yes.

19              THE COURT:  Paragraph (k), do you understand the top

20  of page 8?

21              MR. HARDING:  I do.  I do.

22              THE COURT:  All right.  The Government has made

23  certain commitments as well, and they're set forth in

24  paragraph 7.  In return for the full and truthful cooperation

25  of Barclays and compliance with the terms and conditions of

```
 1   this agreement, the United States agrees that it shall not

 2   seek to prosecute Barclays, its corporate parents,

 3   subsidiaries, affiliates, unless, other than the transactions

 4   that have already been disclosed and documented to the

 5   Government, Barclays willfully transmitted or approved the

 6   transmission of U.S. denominated funds that went to or came

 7   from persons or entities designated at the time of the

 8   transaction by the Office of Foreign Assets Control as

 9   especially designated terrorist, et cetera.  I'm not going to

10   read everything else.

11             You've read paragraph 7 and you understand --

12             MR. HARDING:  I have, Your Honor.

13             THE COURT:  -- the Government's commitments?

14             MR. HARDING:  Yes.

15             THE COURT:  Do you have any questions about what the

16   Government has committed to do?

17             MR. HARDING:  I do not.

18             THE COURT:  Do you realize that its solely -- and

19   this is very important.  Well, everything else is very

20   important, too.  This is especially important.  In the sole

21   reasonable discretion of the United States, the Government can

22   determine whether there has been a material breach of this

23   agreement.  Do you understand that?

24             MR. HARDING:  I do, Your Honor.

25             THE COURT:  All right.  Do you have any questions
```

1    about that?

2         MR. HARDING:  I do not.

3         THE COURT:  All right.  Now, in the event of any

4    breach, paragraph 7 provides that the Government, United

5    States may use any information provided by or on behalf of

6    Barclays to the United States or any investigative agency,

7    whether prior to or subsequent to this agreement, including

8    the attached factual statement.  Do you understand that?

9         MR. HARDING:  Yes.

10        THE COURT:  All right.  Waiver of rights.  Barclays,

11   pursuant to paragraph 8, expressly waives for purposes of this

12   agreement and any action resulting from a breach of this

13   agreement, any challenges to the venue or jurisdiction of this

14   court and any right to be charged by an indictment.  We talked

15   about that, returned by a grand jury.  Do you understand that?

16        MR. HARDING:  Yes, Your Honor.

17        THE COURT:  Paragraph 9, breach of the agreement.

18   This tells Barclays all the things that could happen in the

19   event that there is a breach of this agreement, and I hope

20   you've read this very carefully, Barclays' consents to what

21   could happen in the event of a breach.  Do you understand

22   that?

23        MR. HARDING:  Yes, Your Honor.

24        THE COURT:  Do you have any questions about what

25   could happen in the event of a breach?

1          MR. HARDING:  I do not.

2          THE COURT:  All right.  The parties have agreed that

3    the United States' exercise of discretion under this paragraph

4    is not subject to review in any court or tribunal outside of

5    the Criminal Division of the Department of Justice.  Do you

6    understand that?

7          MR. HARDING:  I believe so, Your Honor, yes.

8          THE COURT:  Well, if you have questions about that,

9    you should tell me now because that's a very --

10         MR. HARDING:  I have been advised.

11         THE COURT:  In fact, they have unfettered carte

12   blanche discretion, unreviewable by anyone other than their

13   own supervisors at the Department of Justice.

14         MR. HARDING:  Yes, Your Honor.

15         THE COURT:  All right.  Any questions about that?

16         MR. HARDING:  No.

17         THE COURT:  All right.  It also provides for tolling

18   the statute of limitations and other things that could --

19   could inure to the detriment of Barclays.  Do you understand

20   that?

21         MR. HARDING:  Yes.

22         THE COURT:  Do you have any questions about it?

23         MR. HARDING:  No.

24         THE COURT:  Paragraph 10 addresses a requirement to

25   obey the law.  And again, the Government has -- has a lot of

1    he leverage here with respect to discovering criminal conduct

2    and the repercussions for discovering criminal conduct in

3    paragraph 10.  Do you understand that?

4              MR. HARDING:  I do, Your Honor.

5              THE COURT:  For the record, Carol, has this plea

6    agreement been filed on the public docket?

7              THE DEPUTY CLERK:  Yes.

8              THE COURT:  It has been.  All right.  This is not

9    under seal, correct, Counsel?

10              MR. GERRITY:  That's correct.

11              THE COURT:  It's a fine time to ask if it's not

12    under seal, right?

13              (LAUGHTER.)

14              THE COURT:  All right.  This agreement, paragraph 11

15    says that this agreement binds Barclays, any of its corporate

16    parents, subsidiaries, affiliates, successors, predecessors

17    and assigns and indeed the shareholders are bound by this as

18    well, I assume.  It's further understood this agreement and

19    all provisions set forth are binding on the United States but

20    do not bind any other federal agencies other than United

21    States and Barclays and those parent subsidiaries, affiliates

22    and associates that I've made reference to.  Do you have any

23    questions about paragraph 11?

24              MR. HARDING:  No, Your Honor.

25              THE COURT:  Paragraph 12.  Very important again.

1    Again, I just want to emphasize, Barclays expressly agrees

2    that it shall not, through its attorneys, board of directors,

3    agents, officers, employees, consultants, contractors,

4    subcontractors, or representatives, including any person or

5    entity controlled by any of them, make any public statement

6    contradicting, excusing or justifying any statement of fact

7    contained in the factual statement.  Do you understand that?

8              MR. HARDING:  I do.

9              THE COURT:  Very important.  Now, if that happens by

10   any of these people set forth named in paragraph 12, or their

11   titles, directors, agents, officers, et cetera, that's a

12   material breach of the plea agreement.  Do you understand

13   that?

14             MR. HARDING:  Yes, sir.

15             THE COURT:  All right.  Do you have any questions

16   about that?

17             MR. HARDING:  No.

18             THE COURT:  And again, it's up to the Government to

19   determine whether there has been a material broach, and that

20   decision is not reviewable by anyone.  So, the stakes are

21   pretty high.  Do you understand that?

22             MR. HARDING:  Yes.

23             THE COURT:  Paragraph 13 deals just with sales or

24   mergers, and have you read paragraph 13?

25             MR. HARDING:  I have.

1          THE COURT:  And I assume the benefits and the

2    burdens of this agreement as set forth in paragraph 13 follow

3    any sale of corporate assets.  Do you understand that?

4          MR. HARDING:  Yes, Your Honor.

5          THE COURT:  All right.  Paragraph 14 says it's

6    further understood this agreement does not relate to or cover

7    any conduct by Barclays other than for any act within the

8    scope of the factual statement in this agreement; is that

9    right?

10          MR. HARDING:  Yes.

11          THE COURT:  Public filing.  It's already been filed.

12    I just inquired.  It's been filed on the public docket of this

13    court.

14          16 basically tells me this is the complete agreement

15    between Barclays and United States, and are you aware of any

16    other agreements?

17          MR. HARDING:  No, Your Honor.

18          THE COURT:  Other than the -- I guess it's probably

19    correct to say other than the Deferred Prosecution Agreement

20    being executed contemporaneously.  That's already been signed,

21    I assume, with New York?

22          MR. BRAFF:  Yes.

23          THE COURT:  New York federal court.

24          MR. BRAFF:  And Your Honor, there are two other

25    agreements with two other agencies as well.

1          THE COURT:  All right.  And what are those?  So the

2    record is clear, which --

3          MR. BRAFF:  OFAC and the Fed.

4          THE COURT:  I'm sorry, OPEC [sic] and --

5          MR. BRAFF:  OFAC and the Federal Reserve.

6          THE COURT:  And the Fed, okay, Federal Reserve.

7    Okay.  All right.  Do you contemplate the proceedings in New

8    York also to memorialize the Deferred Prosecution Agreement?

9          MR. BRAFF:  No, Your Honor.

10          THE COURT:  All right.  Exhibit 1 is the Factual

11    Statement.  I think, normally what -- let me ask you this,

12    Mr. Harding.  Did you sign that factual statement?

13          I think someone needs to -- Well, let me ask you

14    this.  The Government -- does the Government have an executed

15    copy of the factual statement?  Normally someone signs the

16    factual proffer agreeing to what the evidence would have been

17    had this case gone to trial.  I don't see a signature here.

18          MR. GERRITY:  We do not.  It's incorporated into the

19    Deferred Prosecution Agreement.

20          THE COURT:  All right.

21          MR. GERRITY:  So that's why it was not signed, so

22    it's inserted but if the Court --

23          THE COURT:  So, once someone signs the plea

24    agreement, then that person, Mr. Harding has agreed, is also

25    then agreed to the truthfulness of the factual statement then,

1    correct?

2              MR. GERRITY:  That's the Government's position, Your

3    Honor.

4              THE COURT:  All right.  Is that Mr. Harding's

5    position?

6              MR. HARDING:  It is, Your Honor.

7              THE COURT:  All right.  Now, you've read this.  It's

8    a 20-page doc- -- it's a 19-page document, Mr. Harding, of the

9    factual statement.  Have you read it?

10             MR. HARDING:  Yes, Your Honor.

11             THE COURT:  It's incorporated in the plea agreement.

12   Is what set forth in the factual statement true?

13             MR. HARDING:  Yes, Your Honor.

14             THE COURT:  All right.  You kind of paused there for

15   a second.

16             MR. HARDING:  No, no.

17             THE COURT:  All right.  Okay.  It's true.  But

18   normally the Court would get a proffer from the Government as

19   to what the evidence would have been, you know, had this case

20   proceeded to trial, so I'll ask the Government for a brief

21   proffer of what the evidence would have been.

22             MR. GERRITY:  Sure, Your Honor.

23             THE COURT:  I'll ask you to listen very carefully to

24   what the attorney has to say and just tell me, after he

25   finishes making his proffer of what the evidence would have

1   been had this case proceeded differently, you can tell me

2   whether you agree or disagree with what the attorney has said.

3   MR. GERRITY:  Your Honor, if the case had gone to

4   trial, we would have proven that from in or around March 1985

5   and continuing until around September of 2006, that Barclays

6   Bank did willfully violate regulations, namely the -- or

7   namely the regulations issued under the International

8   Emergency Economic Powers Act in violation of Title 50 U.S.

9   Code, Section 1705.

10   We also would have proven that from in or about

11   January 2001 and continuing until in or about September 2006,

12   Barclays Bank PLC did willfully violate regulations issued

13   under the Trading with the Enemy Act in violation of Title 50

14   United States Code, Appendix Sections 5 and 16.

15   And specifically, Your Honor, just as a brief

16   proffer, the Government would have proven further between the

17   mid 1990's and September 2006, Barclays Bank filed

18   instructions not to mention names of various sanctioned

19   countries or entities in transfers.  They used a sundry

20   account which was an internal account to disguise some of

21   those payments for the sanctioned entities.  They amended and

22   reformatted some of the payments and they used a method of

23   payment as cover payments to disguise those same transactions.

24   THE COURT:  All right.  Let me just inquire of

25   Government counsel.  Normally I would -- I would ask questions

about waiver of constitutional rights.  Is that appropriate at
this point?  I think out of an abundance of caution I should.
I'm not --

        MR. GERRITY:  Can I consult with my --

        THE COURT:  Sure.  Because we've already talked
about a waiver of indictment.  There's an information pending.
Prosecution is being deferred.  Yeah, sure, you can consult
with your colleagues.

        (PAUSE.)

        MR. GERRITY:  Your Honor, and I just want to confirm
with my colleagues my -- what I thought.

        THE COURT:  Sure.

        MR. GERRITY:  Because this is a deferred
prosecution.

        THE COURT:  Right.

        MR. GERRITY:  And it's not in fact a plea agreement.

        THE COURT:  Right.

        MR. GERRITY:  The opinion of the Government is, you
would not have to go through the colloquy of the
constitutional rights because at this time it's not an
actual -- it's not a plea.  It's just is a deferred
prosecution.

        THE COURT:  Right.  I think that's probably -- let
me confer with my colleagues for a second.

        MR. GERRITY:  Absolutely.

1          THE COURT:  I think that's absolutely correct, but I

2     don't want to bring Mr. Harding back again.  I mean, you're

3     always welcome, but I don't want to bring you back here next

4     week to do this, but let me talk to you a second.

5          (PAUSE.)

6          THE COURT:  You know what, I think it makes little

7     sense to do that.  I mean, everything is simply being

8     deferred.  What triggers the Court's concern, though, is the

9     filing of that information.  You're waiving speedy trial

10    rights, and indeed the Corporation is waiving whatever right

11    it has to be arraigned.  There's no need to arraign the

12    Corporation today, I don't believe, correct, Counsel?

13          MR. PEIKIN:  That's correct.

14          MR. GERRITY:  The Government agrees with that, Your

15    Honor.

16          THE COURT:  All right.  So those are statutory

17    right -- actually constitutional right for grand jury

18    proceeding.  And you're waiving your right to a speedy trial,

19    and no one is asking for a trial, so I think it's probably --

20    it's probably correct to just recognize that Barclays is

21    deferring prosecution.  So, under those circumstances it's not

22    necessary for the Court to engage in a colloquy for waiver of

23    constitutional trial rights and appellate rights.

24          Is there any appellate right here?  Is there any

25    appellate right that Barclays is giving up for this

1   proceeding?

2          MR. GERRITY:  No, Your Honor.  As far as I know,

3   there is not.

4          THE COURT:  Right.

5          MR. GERRITY:  If Barclays has a concern, but I do

6   not believe --

7          THE COURT:  You know what, out of an abundance of

8   caution, I'll just advise Barclays.  In the event Barclays is

9   under the impression that, or believes that there is something

10  illegal being -- you know, is taking place here, then it

11  certainly has a right to challenge that in the Court of

12  Appeals.  I think that's fair.  But as far as I know there's

13  nothing -- you don't view this proceeding as being illegal

14  against Barclays.

15         MR. BRAFF:  No, Your Honor, we don't.

16         THE COURT:  I think, out of abundance of caution, I

17  think people always have appellate rights to appeal from

18  anything a district judge is doing, I think.

19         So, anyway, you are so -- do you understand your

20  appellate rights?

21         MR. HARDING:  I do, Your Honor.

22         THE COURT:  If you believe something improper is

23  taking place, you have probably 14 days from the date of entry

24  of judgment to exercise whatever rights you have in the Court

25  of Appeals.  I think that's appropriate to do that.

1          You've heard the Government's attorney state what

2     the evidence would have been had this case gone to trial.  The

3     more detailed factual statement is set forth in pages 1

4     through 19 of Exhibit 1.  You've agreed that everything set

5     forth therein is true?

6          MR. HARDING:  Right.

7          THE COURT:  Are there any corrections that need to

8     be made in that factual proffer?

9          MR. HARDING:  Not as far as I'm aware.

10          THE COURT:  All right.  What about the factual

11     statement that is part and parcel of this plea agreement?

12          MR. HARDING:  Not as far as I know.

13          THE COURT:  Any changes that need to be made?

14          MR. HARDING:  No.

15          THE COURT:  There are three waivers that have been

16     signed by Mr. Harding, the Group General Counsel, and

17     Mr. Harding, you've alleged that you are the duly authorized

18     representative of Barclays Bank PLC and we know that a

19     corporation -- corporate resolution has been passed

20     authorizing you to enter into these agreements on behalf of

21     Barclays, correct?

22          MR. HARDING:  Correct.

23          THE COURT:  There is a pending motion.  The Court

24     will grant the joint motion for approval of the Deferred

25     Prosecution Agreement for continuance of all further criminal

1  proceedings.  I'm not going do it for 24 months.  I think --

2  excuse me, I think it's appropriate to bring everyone back,

3  and I'll ask Mr. Harding to come back in three months so I can

4  get an update.

5          I know I said I'll do it every three months.  I'm

6  not sure I'll do it every three months, but I'd like to hear

7  just what has taken place between now and three months from

8  now to make sure -- I'm sure the Government would like to hear

9  as well what is the progress with respect to any change in

10  policies, procedures, et cetera.  Whether I'll do it every

11  three months or not, I don't know, but I'm going to pick a

12  hearing date now for a status hearing in three months.

13          And Carol, why don't we pick a date around noon or

14  so.  Is it better in the afternoon?  I'm going to invite

15  Mr. Harding to come back.  Afternoon is better?

16          MR. HARDING:  Either way, Your Honor.  It doesn't

17  matter to me.

18          THE COURT:  Let's pick a date when I have other

19  matters.  It won't be a long status hearing.  Well, it could

20  be, I don't know.

21          THE DEPUTY CLERK:  November 18 at 12:00 is fine.

22          THE COURT:  How about November the 18th at

23  12:00 o'clock; is that a bad date?

24          MR. BRAFF:  Yes, Your Honor, subject to we are all

25  going and checking our calendars.

1    THE COURT:  You want to check your Blackberry now or

2  something because I rather pick a date now since everyone is

3  assembled.  You can do that.  Sure, you can turn on your

4  phones, sure.

5    (PAUSE.)

6    MR. PEIKIN:  Your Honor, the 18th does not work

7  for Mr. Harding.

8    THE COURT:  All right.  What's a good date for you?

9  How can we accommodate you?

10    MR. PEIKIN:  November 16th, Your Honor.

11    THE COURT:  Carol, is that a good date?

12    THE DEPUTY CLERK:  You don't have any matters

13  scheduled.

14    THE COURT:  Is that a Monday?

15    THE DEPUTY CLERK:  That's Tuesday.

16    THE COURT:  What about the 19th?

17    THE DEPUTY CLERK:  19th is a Friday.  Nothing is

18  scheduled.

19    THE COURT:  The 16th is fine.  We can do that.

20  Just do it at noon on the 16th.  All right.  Is that a good

21  time for the Government?  Is that a good time?

22    MR. GERRITY:  Yes.

23    THE COURT:  All right.  With respect to the

24  deferral, it's not a waiver of any constitutional right.  It's

25  a deferral of constitutional rights, and I'll just talk about

1    it very generally.  Everyone appearing before the Court, and a

2    corporation is certainly no exception, has -- does the

3    corporation have the same constitutional rights as the

4    individual?

5              MR. GERRITY:  Yes, Your Honor.

6              THE COURT:  All right.  I agree.  So we're just

7    deferring any -- all constitutional -- any constitutional

8    rights that the corporation has, and even though the

9    corporation is a foreign entity, it's not incorporated in the

10   United States, I don't believe.

11             MR. HARDING:  That's correct.

12             THE COURT:  All right.  It still has the same

13   constitutional rights as a domestically chartered corporation

14   which would be the right to jury trial, a nonjury trial, or

15   call witnesses, present a defense, cross-examine, appeal or

16   indeed to waive those rights.  Do you understand very

17   generally those constitutional rights?

18             MR. HARDING:  Yes, Your Honor.

19             THE COURT:  And we're just deferring further

20   discussion of those constitutional rights because we're not at

21   the point where anyone is waiving any rights whatsoever

22   because this is not a prosecution.

23             I will ask you, has anyone forced you or threatened

24   you in any way to enter into this Deferred Prosecution

25   Agreement on behalf of Barclays?

1          MR. HARDING:  No, Your Honor.

2          THE COURT:  Do you understand that the agreement

3    that's been reached was indeed reached between Government

4    counsel and maybe yourself or maybe outside counsel for

5    Barclays?

6          MR. HARDING:  Yes, outside counsel.

7          THE COURT:  Outside counsel.  All right.  And that

8    the Court did not participate in that, in any discussions in

9    that regard?

10          MR. HARDING:  Yes, Your Honor.

11          THE COURT:  Has anyone made any promises to Barclays

12    that you're aware of or to you in exchange for your signature

13    on this Deferred Prosecution Agreement?

14          MR. HARDING:  Not that I'm aware of, Your Honor.

15          THE COURT:  Aside from the promises set forth in the

16    agreement itself.

17          MR. HARDING:  Indeed.

18          THE COURT:  All right.  And did you enter into this

19    Deferred Prosecution Agreement on behalf of Barclays, and

20    indeed, did Barclays pass a resolution for authorizing you and

21    it to be a part of this Deferred Prosecution Agreement freely

22    and of its own free will?

23          MR. HARDING:  Yes, Your Honor.

24          THE COURT:  And pursuant to actions by its board of

25    directors?

1          MR. HARDING:  Board of directors, yes.

2          THE COURT:  All right.  Is there anything that you

3     did not understand about this proceeding or about this

4     Deferred Prosecution Agreement, Mr. Harding?

5          MR. HARDING:  No, Your Honor.

6          THE COURT:  All right.  Are you satisfied with the

7     services of your attorneys?

8          MR. HARDING:  I am indeed.

9          THE COURT:  All right.  Is there anything you want

10    to ask me or your attorneys before you make a final decision,

11    that is, this is indeed your act on behalf of Barclays,

12    Incorporated?

13         MR. HARDING:  No, Your Honor.

14         THE COURT:  All right.  And I will make a finding

15    that Mr. Harding impresses me as someone who is extremely

16    competent and capable of making a decision today and indeed on

17    behalf of Barclays, Incorporated, that he understands the

18    nature and consequences of what he's doing, that he's acting

19    voluntarily under the circumstances and of his own free will

20    and on behalf of Barclays and has been duly authorized on

21    behalf of Barclays and that indeed there's an adequate factual

22    basis, and there is an actual -- there's an adequate legal

23    predicate then for this Deferred Prosecution Agreement to be

24    filed with the Court along with the information that's been

25    filed.

1          The Court will, under the circumstances, grant the

2    joint motion for approval of the Deferred Prosecution

3    Agreement, and I've already excluded time under the speedy

4    trial clock and we have a status hearing.  I will sign the --

5    have you read the proposed order that the Government submitted

6    approving the Deferred Prosecution Agreement?

7          You might want to take a look at that.  You may not

8    have seen that.  You might want to take a look at that.  And

9    I'll ask your attorneys as well whether you have any

10   objections to this document.  Does it need to be modified in

11   any respect?

12         I do have one concern.  Normally we would have a

13   written waiver of rights, and I think that even though there

14   has been a colloquy, there should be a written waiver of

15   rights on behalf of Barclays for the record, and then that can

16   be submitted, I'll say, within the next week or so.

17         MR. BRAFF:  We will do so.

18         THE COURT:  You can file that on the electronic

19   docket.  That's the only thing that occurs to me.  Are there

20   any objections to the Court signing this or approving this

21   Deferred Prosecution Agreement by signing this order?

22         MR. HARDING:  None, Your Honor.

23         THE COURT:  Are there any modifications that need to

24   be made?  I'll ask -- also inquire of Government counsel as

25   well.

1           MR. GERRITY:  None from the Government, Your Honor.

2           THE COURT:  Anything else you want in the order?

3           MR. BRAFF:  No, Your Honor.

4           THE COURT:  Okay.  I think the only thing we'll add

5    to it -- this has been filed electronically as well.  The only

6    thing we'll add to this is that a status hearing is scheduled

7    on that date we selected, November the -- was it 18th, Carol?

8           THE DEPUTY CLERK:  16th.

9           THE COURT:  16th at 12:00 o'clock noon.

10          All right.  Anything further, Counsel?

11          MR. GERRITY:  No, Your Honor.

12          THE COURT:  All right.  Thank you very much and

13   thank you for the time and attention you gave to address the

14   Court's concerns.  I appreciate that.

15          MR. GERRITY:  Absolutely.

16          THE COURT:  Anything further?  Any questions?

17          MR. HARDING:  No.

18          MR. BRAFF:  No.

19          THE COURT:  I hope you're able to stay in the

20   country for a few days.

21          MR. HARDING:  I'm afraid not, Your Honor.

22          THE COURT:  All right.  We'll see you in November

23   then.  Okay.  Thank you.  Anything further?

24          MR. GERRITY:  No, Your Honor.

25          THE COURT:  Thank you.  Parties are excused.  Thank

1    you.

2           THE DEPUTY CLERK:  This honorable court stands in

3    recess.

4           (PROCEEDINGS END AT 1:00 P.M.)

5                          *-*-*-*

6

7

8

9

10

11                   **CERTIFICATE OF REPORTER**

12          I, Catalina Kerr, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17

18

19   _____  _____

20   Catalina Kerr                    Date

21

22

23

24

25